VALLEY COMMUNITY PRESER-
VATION COMMISSION, et
al., Plaintiffs,

v.

Norman MINETA, Secretary U.S.
Department of Transportation,
Defendants.

No. Civ.A. 02–1511 RBW.

United States District Court,
District of Columbia.

Sept. 26, 2002.

Andrea Carol Ferster, Washington, DC, for plaintiffs.

Gail Orendorff, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

Plaintiffs, Valley Community Preservation Commission ("VCPC") and several named individuals,[1] have instituted this action for declaratory and injunctive relief against defendants Norman Mineta, in his official capacity as the Secretary of the United States Department of Transportation, Mary Peters, in her official capacity

---

1. The individuals named as plaintiffs include Gerald Joe Ford, Royce Griggs, and Troy Omness. Each of the named plaintiffs lives or owns land in the Hondo River valley in New Mexico where the proposed highway project that is the subject of this litigation is slated to be constructed. Compl. ¶¶ 19–21.

as the Administrator of the Federal Highway Administration ("FHWA"), and Reuben Thomas, in his official capacity as the Division Administrator of the FHWA's New Mexico Division. This matter is before the Court on Plaintiffs' Application for a Temporary Restraining Order and Motion for Preliminary Injunction ("Pls.' Mot.") [# 2]. Defendants have also filed a Motion for Transfer of Venue ("Defs.' Mot.") [# 3], seeking to have this matter transferred to New Mexico. For the reasons set forth below, the plaintiffs' motion for injunctive relief is denied in part and deferred in part, and the defendants' motion to transfer this action to New Mexico is granted.

## I. *Background*

Plaintiff VCPC is "a nonprofit membership organization incorporated under the laws of New Mexico, for the purpose of encouraging the conservation and protection of land, water, historic and cultural resources within the Hondo River valley and Lincoln County, New Mexico ..." Compl. ¶ 10.[2] Plaintiffs allege that the FHWA has failed to comply with Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 23 U.S.C. § 138 (2000), 49 U.S.C. § 303 (2000) ("DTA"), and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(c) (2000), prior to approving a major 37.5 mile highway project to reconstruct U.S. 70 from "a two-lane highway, [to] a continuous four-lane highway through the Hondo valley in Lincoln County, New Mexico, between [the communities of] Ruidoso Downs and Riverside ..." Compl. ¶ 1.[3]

When assessing whether to proceed with the current project, which is needed to address transportation problems in the larger area of the U.S. 70 corridor that is located between Roswell and Ruidoso Downs, New Mexico, three alternatives were considered, *id.* ¶ 27, one being a "no build" alternative. *Id.* ¶ 30. A document prepared by the New Mexico State Highway and Transportation Department ("NMSHTD") in September 1999, entitled "U.S. 70: Initial Corridor Study Report" (the "Corridor Report") determined that two of the bypass alternatives—one using U.S. 54, U.S. 380 and U.S. 246, and the second using U.S. 54, U.S. 349, and U.S. 246, "would partially achieve the need for the Project by providing an alternative route for commercial trucks and through traffic but" were not feasible because (1) trucks would continue to use U.S. 70, which travels through the Hondo River valley, as a short cut; (2) additional improvements would still be needed to address safety issues on U.S. 70, which would increase the project's costs; and (3) businesses located along U.S. 70 would be adversely affected if the traffic flow was reduced. *Id.* The Corridor Report recommended that decision-making concerning the transportation options for the corridor be separated into two segments: (1) a 17 mile segment between Riverside and Roswell ("the Plateau Project") and (2) a 37.5 mile segment between Ruidoso Downs and Riverside ("the Hondo Valley Project").

2. References to "Compl." are to the complaint that was filed in this case.

3. U.S. 70 extends from the Arizona/New Mexico state line in the southwest part of the state to a location in the eastern part of the State of New Mexico. Defendants' Opposition to Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Defs.' Opp'n") at 6. Although it serves commercial traffic, U.S. 70 is a primary access route to many recreational areas, including several mountain resort and campground sites and a gambling casino. *Id.* U.S. 70 is also utilized by the residents of the Hondo valley as their sole means of access to "the larger communities where they work, attend school, and obtain commercial and medical services." *Id.* at 7.

The Plateau Project was approved by FHWA in February 2001.[4] *Id.* ¶ 28.

On May 4, 2001, the FHWA issued a Draft Environment Impact Statement ("DEIS") regarding the Hondo Valley project. This DEIS indicated that the project would be implemented through a "design-build" process, "whereby the design phase and the construction phase of the [p]roject are integrated under a single contract."[5] *Id.* ¶ 29. The DEIS evaluated the two build alternatives, in addition to the "no build" alternative. *Id.* ¶ 30. The second alternative ("Alternative 2") proposed reconstruction of U.S. 70 as "an enhanced two-lane highway" and the third alternative ("Alternative 3") proposed "reconstruction of the existing highway as a continuous four-lane highway." *Id.* The DEIS indicated that Parsons Brinckerhoff ("PB"), an engineering firm, was its principal preparer. *Id.* ¶ 29. Plaintiffs allege that the DEIS did not evaluate any alternatives that would bypass the Hondo Valley on the basis that they had been rejected by the Corridor Report, and that it contained a "cursory" statement identifying the historic properties and archaeological sites, but deferred final determination of the project's effects, as well as mitigation procedures to address any such effects, as these determinations would be made by State Historic Preservation Officer ("SHPO") "in consultation with the public and other stakeholders pursuant to Section 106 of the National Historic Preservation Act ('NHPA'), 16 U.S.C. § 470f, which would be made part of the Final EIS." *Id.* ¶¶ 29, 31.

In September 2001, a Cultural Resource Report was prepared. *Id.* ¶ 32. This report was prepared following "a preliminary cultural resource investigation [that] was conducted to identify and assess historic properties and properties of traditional cultural importance that are located within the limits of the proposed project." *Id.* The Area of Potential Effect ("APE") of the project was identified as being "150 feet beyond the existing [highway's] right of way." *Id.* ¶ 32. On October 31, 2001, the FHWA forwarded the Cultural Resource Report to the New Mexico SHPO for review and comment. *Id.* ¶ 33. On November 15, 2001, the New Mexico SHPO reviewed and commented on the Cultural Resource Report, in which he provided a qualified concurrence with the report's recommendations. *Id.* ¶ 35.[6]

On January 29, 2002, the FHWA issued the Final Environmental Impact Statement ("FEIS"). *Id.* ¶ 39. "The [FEIS] reiterated and adopted the statements in the [Supplemental Draft Environmental

4. Plaintiffs filed an action in the United States District Court in New Mexico challenging the Plateau Project. In *Gerald Joe Ford v. Reuben Thomas*, No. 01–520, plaintiffs' motion for a preliminary injunction was denied and plaintiffs then pursued an interlocutory appeal before the Tenth Circuit. Defs.' Mot. at 3. However, prior to appellate arguments, the FHWA issued its Record of Decision ("ROD") approving the project that is being challenged in this case and plaintiffs withdrew their appeal. *Id.* Less than three weeks later, plaintiffs filed the instant suit in this Court. *Id.* at 4.

5. The design-build method of construction differs from NMSHTD's other construction processes. Instead of three distinct phases of construction (*i.e.*, (1) preliminary design, (2) final design and (3) construction), the design-build method employs two phases—(1) preliminary design and (2) final design and construction. Defs.' Opp'n at 15.

6. The FWHA issued a Supplemental Draft Environmental Impact Statement ("SDEIS") on November 15, 2001, which addressed changes to the project alternatives under consideration. Compl. ¶ 37. Although the SDEIS identified 17 historic sites in the U.S. 70 corridor, it concluded that none of these sites would be affected "because the Project would not destroy the historic character of these properties in their entirety." *Id.*

Impact Statement] SDEIS." *Id.* ¶ 40. It concluded that the two build alternatives would not utilize Section 4(f) protected historic properties (citing the New Mexico's SHPO's qualified concurrence in the letter dated October 31, 2001). *Id.* ¶ 41.[7] Then, on March 15, 2002, just four days after the comment deadline regarding the FEIS, the FHWA issued its Record of Decision ("ROD") for the project, which, although acknowledging that Alternative 2's enhanced two lane proposal was the "environmentally preferred alternative," selected Alternative 3 that will reconstruct the existing highway into a continuous four-lane highway, because of its "greater safety benefits." *Id.* ¶ 43. Plaintiffs contend that neither the DEIS, SDEIS, FEIS, or ROD "explain, quantify, or substantiate the purported greater safety benefit of Alternative [3]." *Id.* ¶ 44. Although identifying the Section 4(f) properties located within the project area, the ROD concluded that the project would not involve the use of any Section 4(f) properties. *Id.* ¶ 45. In addition, according to plaintiffs, although the ROD stated that the FHWA would develop a "programmatic agreement . . . with groups interested in being a consulting party for Section 106 consultation" this consultation was limited to "determinations of effect on previously unidentified cultural resources and potential impacts to identified resources that are affected by

design changes and construction activities." *Id.*[8]

On July 15, 2002, the Advisory Council, the New Mexico SHPO, FHWA and NMSHTD executed a Programmatic Agreement ("PA"), which invited several of the plaintiffs to participate as "consulting parties." *Id.* ¶ 48. The PA concedes that the design-build process that would be utilized for the project might result in "as-yet-unassessed" effects to historic properties during the final design development because aspects of the design had not been finalized. *Id.* The PA, which divides the project into six segments for purposes of design and construction, also establishes a process under which a "Cultural Resource Task Force," which will be composed of representatives of the signatories and concurring parties to the PA, will "consider the effects on identified National–Register–eligible and undetermined historic properties and develop mitigation plans for any adversely affected historic properties within the Project's Area of Potential Effect." *Id.* The PA also establishes a mechanism by which disagreements between the consulting parties concerning determinations made previously regarding the ineligibility of properties for listing in the National Register of Historic Places ("National Register") would be submitted to the Keeper of the National Register. *Id.* ¶ 49. Plaintiffs argue that the project

7. Plaintiffs submitted "extensive comments" to the FEIS on March 11, 2002. Compl. ¶ 42. In their comments, plaintiffs objected to defendants' approval of the project on the grounds that it violated Section 4(f), Section 106, and NEPA. *Id.* Plaintiffs also contended that Alternative 2 would be "safer than Alternative 3 by encouraging higher speed through traffic that is incompatible with the uncontrolled access and local use of U.S. 70." *Id.*

8. The federal Advisory Council on Historic Preservation ("ACHP") submitted a letter to

the FHWA on March 29, 2002, objecting to the ROD's conclusion that the Programmatic Agreement would not include consultation regarding determinations already made by the SHPO. *Id.* ¶ 47. The Advisory Council also questioned the validity of the FHWA's determination that the project would have no effect on historic resources pursuant to Section 106 of the NHPA, and urged FHWA to "reinitiate the consultation process, even for determinations already made by the SHPO, as it was not properly conducted." *Id.*

will utilize the J. and P. Analla Ranches, and the Montano Ranches, which are owned by plaintiff Gerald Ford, and have origins dating back to the 1800's. Pls.' Mem. at 16. Thus, despite defendants' conclusion that modern construction and alterations to these ranches preclude their eligibility for the National Register, the Keeper of the National Register must review this determination.[9] *Id.* In addition, plaintiffs challenge defendants' conclusion that the Rio Ruidoso Acequia and W.P.A. Schoolhouse do not qualify for the National Register. Defs.' Opp'n at 23.

On July 19, 2002, a design-build contract was awarded and executed for the project by the NMSHTD, authorizing the commencement of the final design and construction of the Project. *Id.* ¶ 50. Defendants were scheduled to commence work on the project's draining structures on September 23, 2002, and to install fencing within the project's right of way.[10] Pls.' Memorandum of Points and Authorities in Support of Their Application for a Temporary Restraining Order and Motion for Preliminary Injunction ("Pls.' Mem.") at 3. This initial phase of the project will entail the removal of trees and other vegetation, and plaintiffs seek a temporary restraining order and preliminary injunction because the activities purportedly "will result in irreparable injury to historic and natural resources." *Id.*

## II. *Plaintiff's Application for a Temporary Restraining Order*

### A. Plaintiff's Arguments

Plaintiffs argue that they have met the standard for an award of injunctive relief. First, plaintiffs argue that they have a substantial likelihood of success on the merits because the FHWA violated its own Section 4(f) regulations, which prohibit it from deferring the Section 106 studies necessary to make a determination of whether the project will use Section 4(f) protected historic properties until after the issuance of the ROD. Pl.'s Mem. at 14. Second, plaintiffs argue that they have a substantial likelihood of demonstrating that the FHWA violated NEPA by approving the project without making a detailed assessment of the project's environmental impacts, but instead delegating this responsibility to the highway builders, who would perform "environmental reevaluations" during the design and construction process. *Id.* Plaintiffs also argue that the NEPA process is tainted because the PB engineering firm has a substantial conflict of interest as a result of having entered into a second contract to serve as the administrator of the project during the design-build phase. Pls.' Mem at 23–24. Thus, plaintiffs contend that PB had a financial interest in the outcome of the project but was not disqualified from preparing key NEPA documents and served

**9.** The Keeper of the National Register is the federal official responsible for making final determinations concerning the significance of historic properties and their potential eligibility for the National Register. *See* 36 C.F.R. § 800.4(c); 36 C.F.R. Part 63. Compl. ¶ 49. In their opposition, defendants contend that an eligibility determination from the Keeper of the National Register was not needed because "the SHPO and the FHWA did not disagree about the eligibility for the National Register of any of the historic properties in the project area ..." and review by the Keep-

er is mandated only in cases of such disagreement. Defs.' Opp. at 11, 23; *see also* 30 C.F.R. § 60.4.

**10.** At the hearing on the temporary restraining order that was held in this matter on September 23, 2002, the Court ordered the defendants not to begin the project's construction until a ruling on plaintiff's request for a temporary restraining order was issued. Defendants did not object to this order.

as the principal contractor for the NEPA process, in violation of 40 C.F.R. section 1506.5(c). *Id.* at 24.

Plaintiffs argue that if injunctive relief is not granted they will suffer irreparable harm for which there is no adequate remedy at law. Pl.'s Mem. at 24. Defendants are scheduled to commence work on the draining structures and install fencing within the project right of way in Sections D (between Hondo and Tinnie) and Section F (between Picacho and Riverside) and some in Section 3. *Id.* at 25. Rock-blasting activities will commence in October. *Id.* The irreparable harm plaintiffs will allegedly suffer "includes the removal of trees and vegetation that contributes importantly to the historic landscape." *Id.* In any event, "a temporary restraining order is necessary immediately to preserve the status quo while this Court decides whether to issue a preliminary injunction." *Id.* Plaintiffs also argue that defendants will not be substantially harmed if injunctive relief is granted in plaintiffs' favor and that the public interest favors the issuance of an injunction. *Id.* Plaintiffs state there will be "no identifiable harm" to defendants as a result of the delay that would be occasioned by awarding them temporary injunctive relief, and that this delay is preferable to defendants' having to reverse their actions if permanent injunctive relief is granted. *Id.* at 26–27. Finally, plaintiffs allege that the public interest favors granting injunctive relief, "in light of the strong congressional mandate of Section 4(f) that the protection of historic properties is to be given 'paramount' importance in transportation planning ..." *Id.* at 27.

### B. Defendants' Arguments

Defendants argue that plaintiffs' request for injunctive relief must be denied because, under the deferential standard of review afforded by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (2000) ("APA"), this Court must conclude that defendants have not acted arbitrarily, capriciously, or contrary to law. 5 U.S.C. § 706. First, plaintiffs do not have a substantial likelihood of success on the merits because Section 4(f) only protects historic sites and defendants have rationally concluded that the project will not involve the use of such sites. Defs.' Mot. at 20–25. Regarding the plaintiffs' NEPA claims, defendants contend that plaintiffs have not demonstrated a substantial likelihood of success on the merits because the U.S. 70 design-build process was at least thirty (30) percent completed when the ROD was issued, which is typical of almost all highway projects that the agency approves. *Id.* at 33. Defendants allege that this thirty percent completion mark "fully complies with NEPA" and, in addition, "[o]ther important features of the Project's design were also established by the time of the ROD." *Id.* at 33–34.

Next, defendants argue plaintiffs have failed to establish that they will suffer irreparable harm. *Id.* at 39. Plaintiffs' harm regarding the removal of trees and vegetation is "weak at best[,]" they contend, as the "[i]nitial ground disturbance will only occur at 22 drainage structures in Segments D and F of the Project ... [which will] have no potential to affect historic properties because none of the structures is located in the boundaries or immediate vicinity of any historic properties."[11] *Id.* at 40. In any event, defen-

---

11. Defendants acknowledge that one of the drainage structures is located "250 feet east of the eastern boundary of the Tinnie Historic District[,]" but note that this structure is "located beneath the roadway and is not visible from the eastern edge of the district, so [that] extension of this drainage structure will not be visible from the historic district." Defs.' Opp'n at 40.

dants argue that the potential harm plaintiffs may experience does not outweigh the harm that injunctive relief will cause the defendants. Injunctive relief, according to defendants, would result in "significant delay and shut down costs to the NMSHTD[,]" amounting to a loss of $887,200 per month for a "temporary standby" and $3,296,000 if "a total demobilization were to occur." *Id.* at 41. Finally, defendants argue that the public interest weighs in favor of denying injunctive relief because the U.S. 70 project was initiated primarily to address safety concerns and cessation of the project now could result in additional accidents.[12] *Id.* at 7–8; 42.

## II. Analysis

### A. *Standards of Review*

 Neither NEPA nor the Department of Transportation Act provide an independent cause of action, and therefore review of defendants' actions in this case must be scrutinized according to the standards set forth in the APA. In reviewing the actions of the defendants, the first inquiry the Court must make is "whether the [defendants] acted within the scope of [their] authority." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted). This inquiry also involves a "determination of whether on the facts the [defendants'] decision can reasonably be said to be within [the] range [of their authority]." *Id.* Next the Court must then decide, pursuant to 5 U.S.C. § 706(2)(A), whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)); *MD Pharm., Inc. v. DEA,* 133 F.3d 8, 16 (D.C.Cir.1998) (same). In reaching its conclusion regarding this question, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (citation omitted). Finally, the Court must determine whether "the [defendants'] action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814. Although the Court must make a detailed inquiry into the facts and circumstances underlying the defendants' actions, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

 Regarding injunctive relief, the Court must apply the familiar four-prong test in determining whether plaintiffs are entitled to injunctive relief. This test requires the Court to ask whether (1) plaintiffs have demonstrated that there is a substantial likelihood that they will prevail on the merits of one of their claims; (2) whether plaintiffs have shown that they would be irreparably harmed if injunctive relief is not awarded; (3) whether the issuance of injunctive relief would not "substantially harm" the other parties, and (4) whether awarding the relief is in the public interest. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977) (citing *Virginia Petroleum Jobbers Assoc. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). In applying this test, district courts "employ a sliding

---

12. Accident data compiled by NMSHTD and the New Mexico state police show that there were 556 accidents between 1992 and October of 2000. Defs.' Opp'n at 7. These accidents resulted in 34 fatalities and 289 injuries. *Id.* at 41. These accidents include "a relatively high incidence of sideswipe, head-on, and rear-end collisions and are the result of conflicts between turning vehicles and through-traffic, and failed passing maneuvers." *Id.* The U.S. 70 project was "designed to address these very issues, and it is in the public's interest that the Project be completed in a timely manner." *Id.* at 41–42.

scale under which a particularly strong showing in · one area can compensate for weakness in another." *Sociedad Anonima Vina Santa Rita v. Department of the Treasury,* No. CIV.A.01–1573, 2001 WL 1804108, at *6 (D.D.C. Aug. 13 2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir. 1995)). Under this sliding scale, injunctive relief may be issued where, for example, the moving party has made a particularly strong showing of success on the merits "even if there is a relatively slight showing of irreparable injury." *Id.,* at *7 (quotation omitted). The failure of the moving party to demonstrate irreparable harm, however, is sufficient reason for the district court to refuse to grant injunctive relief. *Id.*

### B. *Analysis of the Merits*

(i) *Plaintiffs' Section 4(f) claims:*

"Federally funded highway projects must comply with a number of statutory requirements." *Corridor H Alternatives, Inc. v. Slater,* 166 F.3d 368, 370 (D.C.Cir. 1999). Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138, 49 U.S.C. § 303, provides in part:

The Secretary [of Transportation] may approve a transportation program or project . . . requiring the use of publicly owned land of a . . . historic site of national, State, or local significance . . . only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the . . . historic site resulting from the use.

The DTA seeks to enforce the nation's policy "that special effort should be made to preserve the natural beauty of the coun-tryside . . . and historic sites." 23 U.S.C. § 138; 49 U.S.C. § 303.

To protect identified historic sites, Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f (2000) ("NHPA") provides that a federal agency, prior to the

approval of the expenditure of any Federal funds on the undertaking . . .[,] [must] take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f. Although the agency must adhere to the requirements as stated in the statute, the NHPA does not mandate that the agency reach a certain conclusion. "The NHPA is a procedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that property." *Friends of the Atglen–Susquehanna Trail, Inc. v. Surface Transp. Bd.,* 252 F.3d 246, 252 (3d Cir. 2001) (citation omitted).

The Advisory Council on Historic Preservation ("ACHP" or "the Council") has established regulations regarding the implementation of Section 106 that the agency must adhere to in order to be in compliance with the section. *Corridor H,* 166 F.3d at 370. First, the agency must identify the "historic properties within the area of potential effects . . ." 36 C.F.R. § 800.4(a)(2). Second, the agency must "identify issues relating to the undertaking's potential effects on historic properties . . ." *Id.* § 800.4(a)(3). Third, if ad-

verse effects [13] are found, the agency has a duty to mitigate such effects. *Id.* § 800.6(a); *Corridor H,* 166 F.3d at 370.

Plaintiffs argue that the defendants in this case failed to comply with the procedural mandates of Section 106 by failing "to complete the consultations mandated by Section 106, including participation by members of the public, the Advisory Counsel, or the Keeper of the National Register, prior to issuing its ROD in March 2002." Pls.' Mem. at 15. Plaintiffs extensively rely on *Corridor H* for their argument that the defendants in this case violated Section 4(f), therefore, a brief recitation of the facts of that case is needed.

In *Corridor H,* the Appalachian Regional Commission had "approved a plan for a 13-state regional highway system that called for the establishment of 23 corridors, each of which would contain a highway that would permit anticipated traffic to proceed in safely ..." 166 F.3d at 370. The FHWA was tasked with mapping the exact routes of each corridor. *Id.* Corridor H, which was the subject of the lawsuit, was to "extend from Interstate 79 ... near Weston, West Virginia, eastward to Interstate 81 ... near Strasburg, Virginia." *Id.* Planning for the project began in the late 1970s and a DEIS was completed in 1981. *Id.* at 371. After a brief suspension in progress on the project, it was decided to proceed with environmental review of the project "in two phases, each of which resulted in the issuance of a draft

EIS." *Id.* A FEIS was adopted in 1996, establishing the boundaries of Corridor H and reaffirming the Commission's decision to utilize a four-lane Build Alternative. *Id.* The FEIS adopted a PA "which established the procedures that would be followed by the FHWA in complying with the requirements of section 106." *Id.* Most importantly, this PA "divided the Corridor into 14 segments or sections and required the FHWA to identify the historic properties in each of them in the sequence set forth in the agreement." *Id.* In addition, the PA stipulated that no work would proceed in any sections "where treatment of historic properties has not yet been finalized." *Id.* Four months later, the FHWA issued its Record of Decision ("ROD") for the Corridor H project, which "incorporated the [PA's] segment-by-segment approach to compliance with section 106." *Id.* at 372. "[T]he ROD specified that its approval of the project was conditional only and would not become final, as to any section of the corridor, 'until the Section 106 process has been completed for that section and for any immediately adjacent section(s).'" *Id.*

In interpreting the corresponding regulations at 23 C.F.R. §§ 771.135(b) and (1), the Court concluded that the agencies failed to "complete the section 4(f) process before the FHWA [issued] the ROD[,]" as required by the regulations and therefore violated Section 4(f). *Id.* at 373.[14] Howev-

---

**13.** "Adverse effects" are defined in 36 C.F.R. § 800.5(a)(1) and are found ·

when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.... Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time,

be farther removed in distance or be cumulative.

**14.** Section 771.135(b) provides, in part, that "[a]ny use of lands from a section 4(f) property shall be evaluated early in the development of the action when alternatives to the proposed action are under study." Section 771.135(1), which is applicable to "actions processed with EISs," provides that the "section 4(f) approval [will be made in] either [the] approval of the final EIS or in the ROD.

er, the Court concluded that the agency had not violated NEPA as it gave "adequate consideration" to the alternative plans that it had before it by taking a "hard look" at these alternatives. *Id.* at 374.

■ Plaintiffs first argue that FHWA violated Section 4(f) by deferring the required Section 106 determinations until after issuance of the ROD. Plaintiffs' Reply to FHWA's Opposition to Application for a Temporary Restraining Order and Motion for Preliminary Injunction ("Pls.' Reply") at 1, 3. Plaintiffs argue that the PA clearly provides for the required Section 106 determinations to be made after the issuance of the ROD and contemporaneously with the final design and construction of the project, an approach the Circuit rejected in *Corridor H.* Pls.' Reply at 8. In this case, the PA identifies several "historic properties" that were explicitly determined not to be eligible for the National Register, such as the Rio Ruidoso Acequia, the J. Analla, P. Analla, and the Montano Ranches.[15] *See* Defs.' Appendix ("App.") Exhibit ("Ex.") 13, Programmatic Agreement at 2. However, the PA does provide that the "eligibility of the E. Sanchez Ranch East, Serrano Ranch and Unnamed rural historic landscapes is undetermined ...[,]" *id.,* while section VI, "Unforseen Effects" states that the "FHWA may identify unforeseen effects to historic properties." In addition, section VII of the PA, which is titled "New Discoveries[,]" explicitly provides that, in the event "previously unidentified properties are identified dur-

ing construction, then construction will cease ..."

While the PA section pertaining to "Unforseen Effects" clearly provides for the contingency of unidentified historic sites being later identified, thus making it appear that all such sites have not been identified as required by *Corridor H,* the answer to whether defendants have violated the section 106 process is not as easy as plaintiffs make it appear.[16] In *City of Alexandria v. Slater,* 198 F.3d 862, 872 (D.C.Cir.1999), *cert. denied* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 27 (2000), which was decided after *Corridor H,* the District of Columbia Circuit rejected a district court's conclusion that the FHWA had violated section 106 by "deciding to postpone the identification of sites where it would conduct certain construction-related activities ... [even though] it [was] at least conceivable that [these activities] could ultimately affect section 106 properties." In distinguishing *Corridor H,* the Circuit Court noted that in *Corridor H* the agency had "postponed *the entire section 106* process for a major highway corridor ..." *Id.* (emphasis added). In contrast, the agency in *City of Alexandria* had only deferred "identification of sites that might be impacted by a small number of 'ancillary activities.' This is quite distinguishable from the 'Programmatic Agreement' we proscribed in Corridor H." *Id.* at 873.

The agency's actions in this case are more akin to *City of Alexandria* than *Corridor H.* The agency has not "postponed the entire section 106 process" but has

---

Where the section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its section 4(f) approval in the ROD."

**15.** The PA also identifies eight archaeological sites that are National Register-eligible. Defs.' App.Ex. 13.

**16.** Although the ROD concludes that "the selected alternative does not involve a use of Section 4(f) properties[,]" Defs.' App.Ex. 4 at 3, plaintiffs note that the PA was adopted four months after the ROD. Pls.' Mem. at 15. Thus, it appears the PA would be the most accurate representation regarding the Section 106 investigation's status.

merely provided for the contingency that section 4(f) properties may be discovered as the construction progresses. Indeed, at this point, the agency has clearly made a determination that the project will not affect historic sites and has adequately identified those sites. And, thus, the Court concludes that plaintiffs have not established a substantial likelihood of success on their claim that defendants have violated Section 106 as a result of the PA's indication that additional sites may be identified.[17]

Plaintiffs next argue the FHWA failed to complete the consultations mandated by Section 106, including participation by members of the public, the Advisory Council, or the Keeper of the National Register, prior to issuing its ROD in March 2002. Pls.' Mem. at 15. In support of this contention, plaintiffs note that the correspondence sent to the Advisory Council, which included letters sent to the New Mexico SHPO and NEPA documents, was not in accordance with the "normal procedures" for implementing Section 106. *Id.* at 6. Pursuant to the Section 106 regulations, plaintiffs argue, the FHWA "must formally notify the Advisory Council and determine

its participation in the consultation and to 'formally invite[ ]' the Advisory Council to participate in the negotiation of the PA. 36 C.F.R. § 800.6(a)(1)." *Id.* Thus, plaintiffs argue, defendants' assertions that they complied with these regulations by sending copies of the correspondence to the Advisory Council, and that the Advisory Council declined to participate, are misleading.[18] However, the record demonstrates that the ACHP has been involved in the section 106 process. Plaintiffs, in essence, argue that the FHWA is incorrect when it represents that the SHPO's concurrences suffice as final determinations regarding National Register-eligibility, for it is the Keeper of the National Register who is the "independent authority to determine whether a property should be listed in the National Register." Pls.' Reply at 8. In addition, plaintiffs contend that the FHWA's assertion that the Keeper of the National Registry is to determine National–Registry eligibility only if the agency official and SHPO disagree is not correct. *Id.* at 9.

However, 36 C.F.R. § 800.4(c)(2) provides, in part:

> If the agency official determines the [National Register] criteria are not met

---

**17.** Plaintiffs' argument that the PA itself "establishes a process for reviewing and revising *all* prior Section 106 determinations[,]" Pls.' Reply at 12, must be rejected. The section cited by plaintiff for this proposition actually states that the "FHWA will ensure the avoidance of adverse effects to any newly discovered eligible cultural properties is the preferred alternative and will utilize all feasible, prudent, and practicable measures to avoid adverse effects." Defs.' App.Ex. 13 at 10. This does not provide that all prior determinations will be re-accessed and/or revised. In addition, although section VIII.A of the ROD provides that "[t]he Area of Potential Effect may need to be adjusted based on future refinements to the project design, which may result in the need for evaluation of National Register eligibility for previously unidentified historic properties ..." this possibility, as construction progresses, does not violate section

106's mandates. *See City of Alexandria,* 198 F.3d at 874 (holding that agency could defer its "identification of section 4(f) properties that might be impacted by construction staging ... [and this fact] in no way absolves it of its responsibility to conduct a section 4(f) analysis when selecting these sites (during the design phase of the project.").

**18.** Additionally, plaintiffs note that when the Advisory Council was made aware of the defendants' actions, it "specifically determined that the FHWA's informal consultation with the New Mexico SHPO did not constitute compliance with Section 106 and was not consistent with the regulations and informed the FHWA that 'the Council intends to participate in the consultation process ... [i]n accordance with 36 CFR Section 800.6(a)(1)(iii).' " Pl.'s Reply at 7.

and the SHPO/THPO agrees, the property shall be considered not eligible. If the agency official and the SHPO/THPO do not agree, or if the Council or the Secretary so request, the agency shall obtain a determination of eligibility from the Secretary pursuant to 36 CFR part 63.

In their reply, plaintiffs cite *Friends of the Atglen,* 252 F.3d at 264, for the proposition that "the applicable Section 106 regulation 'provides that the Secretary [of the Interior] or the [Advisory Council] *can* request such a [National Register] determination at any time, whether or not the [agency] and the SHPO disagree.' " Pls.' Reply at 9 (emphasis added). However, even the language cited by plaintiffs does not support a finding that such determinations can never be made in the absence of the Secretary or the Council, as provided by the clear language of the regulatory provision. In addition, *Friends of the Atglen* analyzed the applicable regulations and explicitly stated that "[i]f the agency and the SHPO agree that the criteria have not been met, the property is considered ineligible." *Friends of the Atglen,* 252 F.3d at 253 (citing 36 C.F.R. § 800.4(c)(2)). It is only where "the agency and SHPO *do not* agree, or if the [Council] or the Secretary of the Interior so requests [that] the agency 'shall' obtain a determination from the Secretary acting through the Keeper of the National Register . . . as to the historic eligibility of the property." *Id.* (emphasis added); *National Mining Assoc. v. Slater,* 167 F.Supp.2d 265, 273 (D.D.C.2001) ("Agencies must identify historic properties and assess their significance, evaluate the impacts that their actions might have on these properties, and seek alternatives

to avoid or mitigate adverse effects. *If they are unable to achieve this final step, the agencies must obtain the ACHP's comments.*") (emphasis added).[19]

Plaintiffs reference a letter sent by the ACHP that was sent to Mr. Thomas on March 29, 2002, in which the Council noted that it "question[ed] the validity of the earlier no effect and no adverse effect determinations made by FHWA, and concurred in by the New Mexico . . . SHPO, since they were carried out under the terms of the Substitution Agreement Between the Advisory Council and the New Mexico SHPO under 36 CFR Section 800.7, which expired in April 1999." Pls.' Reply, Ex. 2, Letter from Advisory Council on Historic Preservation to Mr. Reuben S. Thomas, dated March 29, 2002. In addition, the Council noted that it was "particularly concerned that FHWA did not initiate the consultation process for this undertaking pursuant to 36 CFR Section 800.3." *Id.* However, section 800.3 does not mandate consultation with the public in the instance where it has been determined that the undertaking "does not have the potential to cause effects on historic properties . . ." 36 C.F.R. § 800.3(a)(1). Thus, if it is determined that there is no potential to cause effects, "the agency official has no further obligations under section 106 or this part." *Id.*

■ In its March 29th letter, the Advisory Council stated that it did not appear that interested groups

> were either identified or invited to participate in consultation as required by our regulations. Since the consultation

---

**19.** Although 36 C.F.R. § 800.3(e) provides that, "[i]n consultation with the SHPO/THPO, the agency official *shall* plan for involving the public in the section 106 process[,]" this mandate, however, is qualified by the fact that the "agency official shall identify the appropriate points for seeking public input and for notifying the public of proposed actions . . ." (emphasis added).

process should involve all stakeholders, we believe these parties, at a minimum, should have been afforded an opportunity to review and comment on the identification and evaluation of historic properties and assessment of effect in accordance with our regulations. Likewise, FHWA should have ensured that the public was afforded an opportunity to comment on the findings and determinations made by the FHWA, and provided continued access to information related to historic properties as project planning proceeded. As you initiate discussions for the development of the PA, FHWA should *clarify how the additional consulting parties and public can review all earlier findings and determinations, including determinations of ineligibility.*

Pls.' Reply, Ex. 2 (emphasis added). Defendants argue that they were not mandated to adhere to the findings of the ACHP, as they had determined that there would not be any use of any historic properties. They are correct. *See Friends of the Atglen*, 252 F.3d at 267. In that case, the Third Circuit held that the Surface Transportation Board ("STB") had violated section 106 of the NHPA by failing to consider the comments of the Advisory Council and Keeper of the National Registry regarding its section 106 determinations. *Id.* at 266. However, the court noted that involvement by the Advisory Council was "not required at the identification stage and the STB did not err in not immediately seeking ACHP comments on identification." *Id.* at 265. Where the STB erred, the court held, was failing to give "genuine attention" to the comments of the ACHP once it entered the proceedings, although the agency was "not required to follow the comments and suggestions of the ACHP at any stage ..." *Id.* Thus, "once the ACHP raised its concerns about the way in which historically eligible properties had been

identified and its desire to see further consideration of what properties on the rail line should be identified as historic[,]" the STB had the responsibility to take such concerns "seriously." *Id.*

In this case, the agency clearly took the ACHP's concerns seriously. Once the ACHP sent the defendants a letter stating its concerns, as emphasized by plaintiffs' counsel during the hearing, defendants executed a PA. In addition, the complaint itself states that the "PA also establishes a process between consulting parties concerning prior determinations regarding the in-eligibility of properties for listing in the ... National Register ..." Compl. ¶ 49. Thus, it is clear that the agency took the ACHP's concerns seriously since the ACHP's recommendation that the FHWA "clarify how the additional consulting parties and public can review all earlier findings and determinations, including determinations of ineligibility[,]" Pls.' Reply, Ex. 2, was incorporated into the PA. *See* PA (Defs.' App.Ex. 13) § VIII.B (providing for re-evaluation of properties previously determined ineligible for listing in the National Register if members of the Cultural Resources Task Force or "the general public provide substantive new information in writing to the FHWA ..."). With these steps implemented, the Court concludes that there was no abuse of discretion by the agency in failing to obtain a determination by the ACHP that certain properties were not eligible for listing in the National Registry. *See Friends of the Atglen*, 252 F.3d at 267 ("We hold only that, on remand, the STB must conduct the § 106 process in accordance with the regulations. It must consider the comments and opinions of the Keeper, the ACHP, and other interested parties as to the scope of the *eligible* historic properties ...") (emphasis added); *National Mining*

*Assoc.*, 167 F.Supp.2d at 288–89 (determination of "the effects of an undertaking on historic property ... is solely the responsibility of [the] agency under section 106[,]" and holding that NHPA regulations that gave the ACHP the "authority to review and effectively reverse ... the agency's determination with respect to the effects of an undertaking on historic properties[,]" was not permissible). The agency in this matter carefully considered the comments of the ACHP and, as a result, issued its PA. This is in line with the requirements of Section 106. Therefore, the Court concludes that the plaintiffs' have not demonstrated a substantial likelihood of success on the merits of their Section 106 challenge.[20]

### (ii) *Plaintiffs' NEPA claims*

NEPA was designed to "encourage productive and enjoyable harmony between man and his environment ..." 42 U.S.C. § 4321. Pursuant to NEPA, an environmental impact statement ("EIS") must be prepared for "major Federal actions significantly affecting the quality of the human environment ..." 42 U.S.C. § 4332; *Corridor H*, 166 F.3d at 371. This EIS must include "a detailed statement" regarding:

(i) the environmental impact of the proposed action,

---

**20.** At the hearing on plaintiffs' application for a temporary restraining order, in what the Court views as a last minute attempt to bolster their arguments for injunctive relief, plaintiffs' counsel submitted to the Court a letter from an attorney, Steven C. Sugarman, which attaches a study conducted by Dr. David Kammer. Pls.' TRO Ex. 6. This study "faults the analysis performed to date by [PB] as being inadequate ..." and concludes that

the valleys extending from Riverside to west of Glencoe constitute a rural historic landscape under the terms of the National Register Bulletin 30 and are eligible for the National Register as an historic district under Criterion A, C, and quite likely D. This conclusion is based upon my opinion that the area should be viewed as a cohesive, integrated historic landscape.

As a result of this conclusion, plaintiffs argue, through Mr. Sugarman's letter, that Dr. Kammer's report "constitutes substantive and new information" and thus, pursuant to section VIII.B.1 of the PA, the FWHA is required to "treat the Hondo and Ruidoso River Valleys as eligible for listing on the National Register." Defendants contend that this letter merely disagrees with the agency's substantive conclusions and is not a challenge to the procedures it utilized in reaching those conclusions. Defendants' Opposition to Exhibit 6 to Plaintiffs' Motion for TRO/PI ("Defs.' Ex. 6 Opp'n") at 2. In addition, defendants note that a determination must be made as to whether the information presented by Dr. Kammer's report is "new" and "substantive" and, to the extent it is, "[i]f the FHWA and the SHPO agree [that] the properties we still not eligible, then they are determined not to be eligible." *Id.* at 3. The defendants also note that the SDEIS that was prepared in November 2001, explicitly considered "[t]he potential of the entire Hondo Valley to be a rural historic landscape" and concluded that the "valley as an agricultural landscape does not fit any of the National Register criteria of significance in this larger context." Defs.' App. Ex. 2 at 21.

The Court finds that there is a serious question regarding whether Dr. Kammer's report implicates Section VIII.B.1 of the PA, thus requiring that the Hondo River valley be treated as eligible for listing in the National Register. In any event, in this case brought pursuant to the APA, the Court's role is to determine whether the agencies' actions were arbitrary, capricious or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), and "[i]n applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). As the defendants' counsel was just presented with this information at the hearing in this matter held on September 23, 2002, the Court concludes that the agency must be afforded the opportunity to give careful consideration to it. Therefore, this Court will defer to the District Court for the District of New Mexico on the issue of whether this report constitutes grounds for granting plaintiffs' request for a preliminary injunction.

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment ... and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action ..." 42 U.S.C. § 4332. In situations where an EIS is required, the agency is required to prepare "a concise public record of decision" that describes the factors it considered in making its decision, and must identify "all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered ..." 40 C.F.R. § 1505.2; *Corridor H*, 166 F.3d at 371. The agency must "identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision ..." *Id.*

■ NEPA requires agencies to "take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA's "mandate 'is essentially procedural' ...; the statute requires that agencies assess the environmental consequences of federal projects by following certain procedures during the decision-making process." *City of Alexandria*, 198 F.3d at 866 (citations omitted). NEPA has "twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.... Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97, 103 S.Ct. 2246. The Court's role in reviewing a challenge to an agency's compliance with

NEPA is limited to ensuring "that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Id.* at 97–98, 103 S.Ct. 2246.

■ As already stated, plaintiffs' first argument under NEPA is that FHWA's deferral of the analysis of "important" environmental impacts violates the statute. Pls.' Reply at 14. Defendants concede that the design-build process had only achieved a thirty-percent finalization level at the time of the ROD, but argue that this standard fully complies with NEPA. Defs.' Opp'n at 33. Plaintiffs seem to argue that the agencies have failed to undertake important aspects of the analysis required by NEPA and have instead delegated this responsibility to the highway builders to occur during the design-build process "thereby precluding a full-scale environmental analysis of the Project's impacts at the time of [sic] the federal action was approved." Pls.' Mem. at 22. However, plaintiffs' reliance on *State of Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585 (D.C.Cir.1994) is unpersuasive on this point. In *State of Idaho*, the court held that the agency failed to take the requisite "hard look" at the potential impact of the salvage activity at issue in that case when it "deferred to the scrutiny of others by authorizing salvage subject to conditions that require[d] [the licensee] to consult with various federal and state agencies about the specific environmental impacts that [fell] within their jurisdictions." *Id.* at 595. That is not the case here. In this case, the agencies have conferred with the appropriate state and federal authorities and have not deferred that consultation to the contractors. Instead, the contractors are responsible for initially assessing environmental impacts that arise as the project progresses. However, the DEIS, SEIS,

and FEIS each adequately address the foreseen environmental impacts of the chosen alternative and a comparison of the proposed and chosen alternatives. For example, in chapter three of the DEIS, there is a summary of the environmental impacts of the two-land and four lane alternatives provided. Defs.' App.Ex. 1 at 3–5.

Relying on *Sierra Club v. Babbitt,* 69 F.Supp.2d 1202, 1217 (E.D.Cal.1999), plaintiffs argue that the agency's use of the design-build method in this case violates the NEPA. In *Sierra Club,* the court concluded that the agency's draft Environmental Assessment ("EA"), which also utilized a design-build process, violated NEPA. *Id.* Specifically, the court found the draft EA to be "lacking [in] sufficient detail to understand the nature, extent and location of rock removal, tree removal, vegetation removal, rebuilding of guardwalls (particularly the height) and construction of fills into the Merced River or riparian corridor." *Id.* A review of the DEIS prepared in this case quickly distinguishes it from the document before the Sierra Club court. For example, Table 3–5 of the DEIS provides a comparison of the permanent loss of vegetation, in acres, between alternatives 2 and 3. Defs.' App. Ex. 1 at 3–21. Table 3–2 provides a comparison of the slope cuts and fills for the two alternatives. *Id.* at 3–5. An estimate regarding the number of trees that may potentially be removed within each segment of the project is provided as well. *Id.* at 3–14. The Court finds that, given the totality of information provided in the DEIS, and supplemented in the SDEIS, that the agency has provided sufficient detail to demonstrate that it has taken a "hard look" at the environmental impacts of its actions. Thus, the DEIS in this case does not fall within the ambit of the *Sierra Club* court's holding. *See United States*

*Dep't of Interior v. Federal Energy Regulatory Comm'n,* 952 F.2d 538, 546 (D.C.Cir.1992) (holding that agency did not violate NEPA although it conceded that additional data might impact its analysis and noted that certain evidence " 'was incomplete and inconclusive for answering impact questions on the Upper Ohio River system[.] ... Virtually every decision must be made under some uncertainty; the question is whether the [agency's] response, *given uncertainty,* is supported by substantial evidence and [is] not arbitrary and capricious."). (emphasis in original). Thus, as the agencies here have "establish[ed] a record to support [their] decisions [so that this] court, without substituting its own judgment ... [is] certain that the agency has considered all factors required by the statute[,]" the Court must conclude that plaintiffs have failed to establish a substantial likelihood of success on the merits of their NEPA claim. *Id.*

■ In addition, the Court finds convincing the FEIS's justification for the use of the design-build process in this case. The FEIS specifically provides:

The NMSHTD intends to implement the proposed improvements to U.S. 70 using a "design and build program." The design and build approach is intended to streamline the design and construction process by integrating the final design phase and the construction phase under a single contract. Oversight of the design details, construction specification, and mitigation commitments will remain under the NMSHTD and FHWA.

The purpose of the proposed action is to improve safety of travel on U.S. 70 and to facilitate the adopted economic development goals of the State.

Defs.' App.Ex. 3 at 1–2.[21] This rationale provided by the agency provides further

---

**21.** For a recitation of the accident statistics regarding U.S. 70, *see infra* note 12.

support for its selection of the design-build process in this case, and, as the Court is not free to substitute its judgment for that of the agency, it concludes that the agency has considered the relevant factors in selecting its plan of action. *United States Dep't of Interior,* 952 F.2d at 546.

■ Plaintiffs also fault the ROD for not containing fully developed mitigation plans. Pls.' Reply at 16. However, "[t]here is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *West Branch Valley Flood Protection Assoc. v. Stone,* 820 F.Supp. 1, 8 (D.D.C.1993) ("NEPA does not require that a complete mitigation plan be actually formulated and incorporated into the EIS.") (citation omitted). The ROD clearly identifies several mitigation plans, such as a Visual Impact Mitigation Plan, a Tree Replacement Plan, a Revegetation Plan, and a Wetland Mitigation plan, that will be implemented as needed. Defs.' App.Ex. 4 at 16–23. As "it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act[,]" the Court finds that contrary to plaintiffs' position, the defendants have taken the requisite "hard look" at the potential environmental impacts of their actions and have complied with NEPA's procedural requirements. *See also Sierra Club,* 69 F.Supp.2d at 1231 (holding defendants did not act "arbitrarily or capriciously" by utilizing a design-build process that

required it to "defer[ ] analysis and mitigation of impacts.").

In addition, the Declaration of Gregory D. Rawlings, an environmental specialist with the New Mexico FHWA, provides the uncontroverted statement that the public was afforded with notice and copies of the DEIS and there were public hearings held to present the DEIS and to receive comments. Rawlings Decl. ¶ 10. In response to comments received concerning the DEIS, "the NMSHTD and the FHWA decided to conduct additional cultural resource studies, including expanding the area of potential effect and evaluating potential cultural landscapes." *Id.* ¶ 11. Defendants do not claim that the design plans for the project were fully finalized at the time the FEIS was signed or when the ROD was issued. The fact that there may be uncertainties that the agency cannot account for due to unforeseen changes in the project's construction does not vitiate the entire NEPA process that it has clearly engaged in. *See Baltimore Gas & Elec. Co.,* 462 U.S. at 90, 99 (holding that agency's decision that nuclear power plant licensing boards should make assumption, pursuant to NEPA, that permanent storage of nuclear wastes "would have no significant environmental impact and thus should not affect the decision whether to license a particular nuclear power plant[,]" did not violate the APA where, although it was clear that the agency relied on "assumptions which involve[d] substantial uncertainties[,]" the agency determined that the uncertainties were "not sufficient to affect the outcome of any individual licensing decision."). The Court finds that the evidence in the record demonstrates that the defendants have "carefully consider[ed detailed information concerning significant environmental impacts ... [and] that the relevant information [was] ... made available to the larger audience that may also play a role in both the decisionmaking

process and the implementation of that decision." *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835. As it is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process[,]" the Court cannot conclude that there is a substantial likelihood that plaintiffs' procedural challenge to the defendants' actions will be successful.[22]

■ Next, plaintiffs argue that defendants have violated NEPA by utilizing the services of a contractor who has an interest in the outcome of the project. In *Citizens Against Burlington, Inc. v. Busey IV,* 938 F.2d 190 (D.C.Cir.1991), the Circuit Court held that the Federal Aviation Administration ("FAA") violated NEPA when it published an environmental impact statement that was prepared by a contractor that the agency itself did not select. *Id.* at 202. The court noted that the Council on Environmental Quality's (CEQ) regulations require that an environmental impact statement " 'be prepared directly by or by a contractor selected by the lead agency.' " *Id.* at 201 (citing 40 C.F.R. § 1506.5). In addition, the court stated that the agency's more serious infraction was its failure to "fill out the disclosure form exacted of consultants that prepare environmental impact statements." *Id.* at 202. Because CEQ regulations "prohibit broadly any 'financial or other interest in the outcome of the project" and because a conflict of interest has been interpreted to mean " 'any known benefits other than general enhancement of professional reputation[,]' " the court ordered the FAA to have the agency complete the conflict of interest form and "should the agency find that a conflict exists, to decide—prompt-

ly—on the measures to take in response." *Id.*

However, in *Associations Working for Aurora's Residential Environment v. Colorado Dep't of Transportation,* 153 F.3d 1122 (10th Cir.1998), the court held that to the extent that the contractor, who assisted the FHWA in the preparation of the EIS, had a conflict of interest, the fact that the agency involved "independently and extensively reviewed all of the Contractor's analyses, commented on the Contractor's field data ... and frequently required the Contractor to gather more facts or perform supplemental analysis on aspects of the project[,]" provided sufficient reason to conclude that the EIS's "integrity and objectivity" was "protected." *Id.* at 1129. The plaintiffs in *Associations Working for Aurora* argued that the contractor in that case "operated under a conflict of interest because [the agency] consistently award[ed] final design contracts to the firm that prepare[ed] the EIS and the Contractor ... received the final design contract through a non-competitive bid process." *Id.* at 1128. The court stated that when an EIS is challenged based on an alleged conflict of interest, the court "can evaluate the oversight that the agency provided to the [EIS] process as a factual matter and make a determination upholding the [EIS]." *Id.*

In this case, there has been uncontroverted evidence presented by defendants that they have provided the requisite oversight of the contractor's preparation of the reports involved in this matter. *See* Rawlings Decl. ¶ 11 (Contractor prepared a cultural resources survey, which the "FHWA

---

**22.** On this point, the Court notes that the ROD in this matter specifically notes the concerns raised by VCPC and other groups, and provides information addressing each of these concerns. Thus, it is clear that plaintiffs, and other members of the public, were provided the opportunity to comment on the defendants' decision, and that their comments were evaluated. *See* Defs.' App., Ex. 4 at 5–16. The fact that these suggestions were not adopted is not alone sufficient reason for the Court to question the agency's decision.

reviewed and approved ...); ¶ 13 (Contractor "conducted additional cultural resource investigations in December 2001" that the FHWA reviewed ...). Although plaintiffs may later obtain evidence to refute the representations made in this declaration, having failed to do so at this juncture, the Court holds that they have failed to demonstrate a likelihood of success on their claim that defendants have violated NEPA by utilizing an engineering firm with a conflict of interest.

■■■ Thus, based upon the evidence in the record at this stage in the proceedings, the Court cannot conclude that plaintiffs have demonstrated a substantial likelihood of success on the merits of either their Section 4(f) or NEPA claims, and thus their request for temporary injunctive relief must be denied.[23]

### III. Defendants' Motion for a Transfer of Venue

Defendants have filed a motion seeking a transfer of this action to the United States District Court for the District of New Mexico. Defendants argue that the private considerations in this matter favor transfer to New Mexico because there is no "meaningful nexus between the District of Columbia and this case," and that the District of New Mexico already has famil-

iarity with the issues involved in this case, as a result of a prior case plaintiff filed there. Defs.Mot. at 19. Defendants also argue the New Mexico has an interest in having this dispute decided locally. *Id.* at 15–16.

Plaintiffs oppose the motion to transfer. First, plaintiffs argue that venue is proper in the District of Columbia because the offices of Secretary Mineta and FHWA Administrator Mary Peters are here. Plaintiffs' Opposition to Defendants' Motion to Transfer Venue and Opposition to Defendants' Motion to Expedite Motion to Transfer Venue ("Pls.' Opp'n") at 2. Regarding the private interest factors, plaintiffs note that because this is an administrative review case, there will likely be no need for witness testimony, which renders irrelevant the fact that the individuals with personal information about this matter all reside in New Mexico. *Id.* at 7. Plaintiffs further argue that the instant litigation has a "strong factual nexus to Washington, D.C." *Id.* at 4. For example, as a result of the experimental nature of the "design-build" method at issue in this case, the FHWA's District of Columbia headquarters will need to review and approve the use of the method in this case. *Id.* In addition, the PA was signed by the Chairman of the Advisory Council, and by the President of the National Trust for Histor-

---

**23.** Aside from determining that they have failed to establish a substantial likelihood of success on the merits of their claims, an additional barrier to plaintiffs in this case is the Court's reluctance to summarily conclude that the public interest lies with their position. While the destruction of plant-life and natural resources is surely of great public concern, defendants argue that cessation of the project at this point might further increase the number of injuries and fatalities that have and continue to occur on U.S. 70 as a result of the highway's current design. At the request of the Court, defendants submitted supplemental accident and injury information regarding U.S. 70, which shows that

since August 1, 2002, five fatalities have occurred on the portion of U.S. 70 designated for reconstruction, including the deaths of two nineteen-year olds. *See* Ruidoso News except, dated September 4, 2002. While plaintiffs conclude that these "recent accidents do not justify the denial of the requested injunctive relief as being contrary to the public interest" and that the "public interest lies with Plaintiffs, who are seeking to enforce ... the protection and preservation of historic properties ..." the Court is not prepared to agree that the preservation of historic resources outweighs the preservation of human lives, thus mandating a finding that the public interests lies with plaintiffs' position.

ic Preservation, who both have their offices in this District. *Id.* at 5. Moreover, one of plaintiffs' lead counsel resides in the District of Columbia. *Id.* at 9 n. 3.

Regarding public interest factors, plaintiffs contend that the prior litigation they filed in New Mexico involved "both facts and law that are materially different from the facts and governing law at issue here . . ." *Id.* at 10. In addition, a change of venue to New Mexico would prejudice plaintiffs as the local rules there, unlike here, do not guarantee a hearing on a preliminary injunction within a designated period of time and, in fact, the prior litigation instituted by plaintiffs was dismissed "because the district court failed to issue an injunction halting construction of the project, and the resulting completion of that project rendered the case moot." *Id.* at 12. Finally, plaintiffs argue that there is no interest in having this case resolved locally in New Mexico and defendants have not submitted any evidence that local citizens there are interested in this dispute. *Id.* at 13. In any event, they argue, "this case will not require an evidentiary trial, and there are likely to be very few in-court proceedings that local citizenry could attend." *Id.* This case is also not a purely "local" controversy, plaintiffs note, as eighty percent of the funding for the project is federal, and there is national policy underlying the plaintiffs' request for relief. *Id.*

 Section 1404(a) of Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." As the moving party, defendants bear the burden of establishing that the transfer of this action to another federal district is proper. *Shenandoah Associates Ltd. Partnership v. Tirana,* 182

F.Supp.2d 14, 25 (D.D.C.2001). Although the plaintiffs' choice of forum is given deference, this deference is "greatly diminished when the activities have little, if any, connection with the chosen forum." *Armco Steel Co. v. CSX Corp.,* 790 F.Supp. 311, 323 (D.D.C.1991) (citation omitted).

 The first question the Court must decide in assessing whether this case should be transferred, is whether this action could have been brought in New Mexico. The answer is yes. Pursuant to 28 U.S.C. § 1391(a) (2000) venue is proper in a "judicial district where any defendant resides . . . [or] in which a substantial part of the events or omissions giving rise to the claim occurred . . . [or] a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." Clearly, the events or omissions of greatest significance to this litigation occurred in New Mexico, and defendant Thomas resides there.

Although convenience of the parties, convenience of the witnesses, and the interests of justice are the three principal factors to consider in determining whether to transfer a case, courts have also considered various other factors, including the private interests of the parties and the public interests of the court, as additional considerations "protected by the language of Section 1404(a)." *Trout Unlimited v. United States Dep't of Agriculture,* 944 F.Supp. 13, 16 (D.D.C.1996). The private considerations that may be considered include:

(1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff

and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. *Id.* (citations and footnotes omitted).

Plaintiffs have chosen this forum, primarily it seems to take advantage of a procedural rule that guarantees them a hearing on their motion for injunctive relief within a specific amount of time. Pls.' Opp. at 14. Defendants' choice of forum is New Mexico, which is where the plaintiffs' claims arose. Moreover, the highway project at issue is located in New Mexico. As plaintiffs correctly point out, however, this being an APA case, there will probably not be a need for witnesses to testify so their location does not decidedly weigh in defendants' favor. But, the ease of access to sources of proof favors transfer, and defendants accurately note that the administrative record in this matter is voluminous and is currently located in New Mexico. Defs.' Mot. at 13. As one member of this Court has recognized, "[w]hen the administrative record is the 'only source of proof' that will be seen by the Court, it is appropriate to consider its location." *Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 15 (D.D.C.2000) (holding that because the record in the case involved 3,700 documents and was located in Alaska, "this factor weigh[ed] in favor of transfer.").

Turning to the public interest considerations regarding transfer, "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home" are factors relevant to the Court's analysis. *Trout,* 944 F.Supp. at 16 (footnotes and citations omitted). Consideration of the first two factors does not dictate that this action be transferred. As the action concerns federal law, neither court is better

suited than the other to resolve these issues. In addition, neither party has submitted information regarding the congestion of the district court in New Mexico, although this Court can attest to its own heavily congested docket. This second factor is therefore of no moment. However, the third factor clearly favors granting the motion to transfer as it is clear that the subject-matter of this lawsuit is solely concentrated in New Mexico. It was New Mexico authorities who prepared the project documents in this case. In fact, plaintiff argues that a New Mexico engineering firm's involvement in the case taints the administrative process. And the project at issue is located in New Mexico. Thus, despite plaintiffs' contentions that the present action has a substantial nexus to the District of Columbia, it appears that all the primary decision-makers and actors in this matter reside in New Mexico. Therefore, although the Court normally gives "substantial deference" to a plaintiff's choice of forum, the defendant's burden in a motion to transfer "decreases when the plaintiff's choice of forum has no meaningful nexus to the controversy and the parties." *Greater Yellowstone Coalition v. Bosworth,* 180 F.Supp.2d 124, 128 (D.D.C. 2001) (citation omitted); *Citizen Advocates for Responsible Expansion, Inc. (I-CARE"), v. Dole,* 561 F.Supp. 1238 (D.D.C. 1983).

In *I-CARE,* a non-profit Texas organization "dedicated to the well-being of Fort Worth, Texas, the National Trust for Historic Preservation, headquartered in the District of Columbia, and two Fort Worth citizens[,]" brought an action against defendants for alleged violations of NEPA and the DTA concerning the planning and construction of two segments of highway located in Forth Worth. *Id.* at 1239. In granting the defendants' motion to transfer the action to Texas, the Court noted

that the "[p]laintiffs here have little connection to this forum, but strong ties to the Northern District of Texas." *Id.* Plaintiff I–CARE was an "organization composed of Forth Worth citizens and groups dedicated to improving their city." *Id.* In addition, although the National Trust was located in the District of Columbia, it relied upon the fact that approximately 900 of its members resided in the Forth Worth area, which the court said "demonstrate[d] that [the National Trust] too [was] closely connected to [Texas]." *Id.* at 1239–40. Most noteworthy to the court was the fact that there was a demonstrated interest by Texas residents in the controversy. Indeed, the court noted that "the Mayor of Fort Worth ha[d] expressed his concern over the resolution of the controversy. In sum, the connection of this dispute to the Forth Worth community is indisputable." *Id.* at 1240. Finally, although the Court recognized that docket congestion in the Forth Worth district court appeared to have been "one of the primary reasons, if not the primary reason, for plaintiff's choice of forum[,]" the court stated that "even [with] a crowded docket, cases such as this one seeking preliminary relief are given expedited consideration and therefore rapid resolution of this matter is still available." *Id.* at 1240 n. 1.

The *I–C* case has many similarities to the instant case. Like the plaintiff organization in I–CARE, the plaintiff organization here is dedicated to the "purpose of encouraging the conservation and protection of land, water, historic and cultural resources" in a jurisdiction other than the forum chosen by plaintiffs. In addition, plaintiffs have raised a procedural concern about their ability to receive expeditious resolution of this dispute by the New Mexico district court. While there has not been the same demonstration of local interest in the controversy as presented in *I–CARE*, it is nonetheless apparent to the

Court that there would undoubtedly be greater interest in New Mexico than the District of Columbia regarding the construction of a New Mexico highway, especially a highway with an unusually high rate of traffic accidents that have resulted in numerous injuries and fatalities.

In *Greater Yellowstone Coalition*, the court declined to grant the defendants' motion to transfer the action, which consisted of a NEPA challenge against the agency, to the federal District of Montana. 180 F.Supp.2d at 126. At issue in that case were grazing permits and the effects of the permits on bison in the Yellowstone National Park. *Id.* In declining to transfer the action, the court noted that although venue would have been proper in Montana, the case involved the "interpretation of federal statutes, not simply the management of bison." *Id.* at 128. In addition, the court noted that plaintiffs' contention that many high-ranking government officials in Washington, D.C., had been involved in the inter-agency discussions regarding the issuance of the grazing permit at issue, was not disproven by the defendants. *Id.* Thus, "because both of the plaintiffs' counts focus on interpretation of federal statutes, and because federal government officials in the District of Columbia were involved in the decision ... this case has some national significance and has a nexus to the District of Columbia." *Id.* Finally, the Court noted that the public interest consideration that disfavors forum shopping weighed against the defendants' efforts to transfer the case. *Id.* at 129. Defendants had requested that the case be transferred to a specific judge in Montana, as he was presiding over and had presided over issues closely related to the instant controversy. *Id.* Addressing this position, the court found that "the defendants' request to transfer th[e] case to a specific judge [was] suspect" in light of the court's

conclusion that contrary to defendants' representations, the other cases presided over by the Montana judge actually differed substantially from issues currently before the court. *Id.* at 130.

In this case, plaintiffs allege that District of Columbia officials will have to approve the design-build method and, because the method is novel, this case presents an issue of national interest. In addition, they argue that this case involves matters of purely federal statutory interpretation. Also, as in *Greater Yellowstone,* they raise the possibility that defendants are seeking a transfer to a more favorable forum because the New Mexico court does not have a local rule that provides for expedited resolution of requests for injunctive relief. And admittedly, this fact weighs against transfer of the action. *But see Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency,* 939 F.Supp. 1, 4 (D.D.C.1996) (transferring action to Virgin Islands despite plaintiffs' claims that they would be unable to receive a fair trial there even though evidence was in the record that plaintiffs' counsel and witnesses had suffered some "low-level harassment"; the court based its ruling on plaintiffs' failure to "establish that the District Court of the Virgin Islands cannot uphold the high standards of the federal bench to conduct a fair and impartial trial.").

Unlike *Greater Yellowstone,* there has not been, to date, decision-making involvement by high-ranking federal officials who are located in the District of Columbia. However, plaintiffs state that because the design-build process is novel, it will have to be approved by federal officials in Washington, D.C. But plaintiffs have not demonstrated that officials in this jurisdiction have been involved in the decision to use that process, *cf. Wilderness Soc'y,* 104 F.Supp.2d at 14 (D.D.C.2000) (denying defendants' motion to transfer venue where evidence showed that "Secretary Babbitt's involvement in the DOI's review ... was far from routine. He made a six-day visit to the area, and met with and was briefed by local Inupiaq Eskimo residents, government and industry officials and scientists[,]" and there was national interest in the issue), or that they will be involved in reviewing the design-build process in the future. In fact, their claim that there will be such involvement in the future is nothing more than pure speculation.

Therefore, in the absence of a demonstrable nexus between the District of Columbia and the plaintiffs' action, and given the totality of the factors involved in making the decision to transfer an action, the Court concludes that this case should be transferred to the District of New Mexico. *See Greater Yellowstone,* 180 F.Supp.2d at 128 ("Most critical to [the] analysis of private factors is whether the nexus between the operative facts and parties to the District of Columbia is sufficient to warrant the court giving deference to the plaintiff's choice of forum."). In addition, the Court that decides this case will be called upon to scrutinize whether the defendants chose an alternative for redressing a New Mexico safety issue concerning one of its highways. Surely, a federal district judge in New Mexico will be better suited to evaluate that issue. At bottom, the resolution of this action will have its most profound impact on New Mexico residents who live in the area of the proposed construction project. And as a former member of this Court prudently stated, "justice requires that such localized controversies should be decided at home." *I–CARE,* 561 F.Supp. at 1240.

## IV. *Conclusion*

The Court concludes that the plaintiffs have not satisfied the requirements for obtaining a temporary restraining order,

and therefore the request for that relief must be denied. However, having decided that this case should be transferred to the United States District Court for the District of New Mexico, the decision about whether injunctive relief should be granted will be left for that court to decide.[24]

### ORDER

This matter came before the Court on Plaintiffs' Application for a Temporary Restraining Order and Motion for Preliminary Injunction [# 5] and Defendants' Motion for Transfer of Venue [# 3]. For the reasons set forth in the Memorandum Opinion that accompanies this order, it is hereby

**ORDERED** that plaintiffs' application for a temporary restraining order is denied. It is further

**ORDERED** that the defendants' motion to transfer this matter to the United States District Court for the District of New Mexico is granted. The Clerk of this Court shall transfer the case file pertaining to this matter, along with a certified copy of this Court's opinion to the United States District Court for the District of New Mexico. It is further

**ORDERED** that consideration of plaintiff's motion for a preliminary injunction is deferred for a future ruling by a judge of the United States District Court for the District of New Mexico. It is further

**ORDERED** that defendants' motion for expedited consideration of its motion to transfer [# 6] is denied as moot.

24. An order consistent with this Memorandum Opinion accompanies this opinion.