**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 23 2004**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VALLEY COMMUNITY
PRESERVATION COMMISSION, a
New Mexico non-profit corporation;
GERALD JOE FORD; ROYCE
GRIGGS; and TROY OMNESS,

        Plaintiffs-Appellants,

    v.

NORMAN MINETA, Secretary, U.S.
Department of Transportation; MARY
PETERS, Administrator, Federal
Highway Administration; and
REUBEN THOMAS, Division
Administrator, Federal Highway
Administration, New Mexico Division,

        Defendants-Appellees.

No. 03-2016

---

**APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV-02-1306 LH/WWD)**

---

Andrea Carol Ferster (Heather Anderson, Steven Sugarman, and Kelly Mack
Cassels with her on the briefs), for Plaintiffs-Appellants.

Matthew J. Sanders (Thomas L. Sansonetti, David Sett, and Robert H. Oakley
with him on the brief), for Defendants-Appellees.

Before **TACHA, HENRY,** and **ANDERSON,** Circuit Judges.

**HENRY,** Circuit Judge.

The Valley Community Preservation Commission and three individual plaintiffs ("Plaintiffs") appeal the district court's denial of their motion for preliminary injunction and injunction pending appeal challenging the Federal Highway Administration ("FHWA")'s approval of plans to reconstruct a 37.5 mile segment of Highway US 70 in southeast New Mexico. The Plaintiffs argue that the FHWA violated Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), by failing to conduct the necessary reviews and investigations to determine whether the project will entail a "use" of historic properties protected under Section 4(f) prior to approving the project for construction. We exercise jurisdiction pursuant to 18 U.S.C. § 1292(a)(1) and affirm.

As plaintiffs seek an injunction, we review the district court's denial of relief for abuse of discretion, considering the well-established four-part standard for injunctive relief. We begin by summarizing the rather distended factual situation in this case. Next, we provide some background on the relevant statutes and regulations and the standard of review. Finally, we address the four preliminary injunction factors, giving particular emphasis to the likelihood of

success on the merits.

## I. FACTUAL BACKGROUND

Highway US 70 runs though New Mexico from the southern portion of the Arizona/New Mexico state line to the near east-central New Mexico/Texas state line. The 37.5 mile segment of US 70 at the center of this litigation connects Ruidoso Downs and Riverside in the Hondo River Valley. This stretch of highway has been designated the "Billy the Kid National Scenic Byway" by the FHWA and is known for its "rich historic associations and its exceptionally striking scenery, including historic homesteads, rural landscapes, roadside fruit stands, and a network of 'acequias' (historic irrigation ditches) that are an integral part of the area's history and culture." Aplts' Br. at 1. Unfortunately, this stretch of US 70 is also known for its alarmingly high accident rate: prior to the current expansion project, the New Mexico State Highway and Transportation Department ("NMSHTD") reported that this portion of highway had an accident rate "twice the state average for rural undivided highways" and a fatality rate "more than double the national average." Aples' Supl. App. vol. II, at 172 (Final Environmental Impact Statement).

In 1999, the NMSHTD prepared a report entitled "U.S. 70: Initial Corridor Study Report," which considered a number of alternatives to alleviate traffic problems and improve highway safety on US 70. The NMSHTD's

recommendations included a proposal to expand the 37.5 mile segment of US 70 between Ruidoso Downs and Riverside, known as the "Hondo Valley Project."

The FHWA first addressed the potential impact of the Hondo Valley Project on historic and cultural resources in a Draft Environmental Impact Statement ("EIS"), published on May 4, 2001. The Draft EIS considered three alternatives to improve highway safety on US 70: 1) a no-build alternative; 2) an enhanced two-lane alternative with "the addition of passing lanes . . . , the addition of acceleration and deceleration lanes at major driveways . . . , the addition of center turn lanes . . . , and the addition of continuous, consistent-width shoulders," Aples' Supl. App. vol. I, at 36; and 3) a four-lane alternative in which the existing two-lane highway would be reconstructed as a continuous four-lane highway. Proposals to by-pass US 70 through the creation of alternative routes were eliminated from further consideration after the FHWA determined that "the development of alternative routes would not substantially reduce the safety problems with the existing alignment of US 70." *Id.* at 33.

Initial investigations established that the project would impact portions of eighteen acequias, seventeen archeological sites, and fifteen buildings. The Draft EIS recommended additional investigations for six of the archeological sites, but did not recommend further investigations of any of the buildings or acequias, concluding that the identified buildings "are either not sufficiently old to be

-4-

considered eligible for the National Register of Historic Places, or they do not maintain sufficient integrity to convey their historic significance and are therefore not eligible." *Id.* at 100. The Draft EIS also concluded that "individual functioning acequias are not eligible for inclusion on the National Register as historic properties," *id.* at 99, and that "the project will retain the integrity of the Rio Hondo system," *id.* at 100, thus alleviating any Section 4(f) concerns related to the acequias.

Following the publication of the Draft EIS, the Parsons Brinckerhoff Archeology Group prepared a Cultural Resources Survey of the US 70 corridor between Ruidoso Downs and Riverside at the request of the FHWA. The survey included an account of the properties in the corridor, whether each was potentially eligible for the National Register, and whether each would be affected by the Hondo Valley Project. The survey did not uncover any potentially eligible properties that would be affected by the project. The FHWA sought comments from the New Mexico State Historic Preservation Office ("SHPO") regarding the determinations in the Cultural Resources Survey. Based on the survey and consultations with the SHPO, the FHWA issued a Supplemental Draft EIS on November 15, 2001. The Supplemental Draft EIS evaluated seventeen buildings, structures, and landscapes that either are or may be eligible for the National Register and concluded that none would be affected by the project. The FHWA

solicited additional comments from the SHPO and other agencies following the publication of the Supplemental Draft EIS, and Parsons Brinckerhoff prepared a Supplemental Cultural Resources Survey. The findings of that survey were included in the Final EIS, issued by the FHWA on January 29, 2002.

The Final EIS concluded that the Hondo Valley Project would not affect any Section 4(f)-protected properties or resources. The FHWA published this final determination in a Record of Decision ("ROD") on March 15, 2002, and the SHPO concurred in the FHWA's finding that no 4(f)-protected properties would be used by the construction project. The ROD approved Alternative 3, the four-lane alternative, for construction, despite acknowledging that the enhanced two-lane alternative was the environmentally-preferred option, "[b]ecause of the greater safety benefits of Alternative 3 and consistency with adopted State policy to provide four lanes on US 70." Aplts' App. vol. II, at 532 (ROD).

The FHWA also voluntarily committed in the ROD "to develop[ing] a programmatic agreement with SHPO, the National Trust, and other groups interested in being a consulting party with respect to implementation of the project." *Id.* at 538. The FHWA, the NMSHTD, the Advisory Council on Historic Preservation,[1] and the New Mexico SHPO signed a Programmatic

_____

[1] The Advisory Council on Historic Preservation is an independent federal agency charged with exclusive authority for developing regulations pertaining to

(continued...)

-6-

Agreement on July 12, 2002; concurring parties included the National Trust for Historic Preservation, the New Mexico Heritage Preservation Alliance, the Mescalero Apache Tribe, and St. Anne's Episcopal Church. The Valley Community Preservation Commission and Gerald Ford, both plaintiffs in this case, were given the opportunity to participate in the Programmatic Agreement as concurring parties, but declined to do so.

On September 4, 2002, Plaintiffs applied for a temporary restraining order and preliminary injunction in the United States District Court for the District of Columbia to halt construction on the Hondo Valley Project. They argued that the widening of the highway will "require massive cuts into the slopes and huge fill slopes supported by retaining walls" and that "[a]s a result, the Project will have unavoidable adverse impacts on historic properties." Aplts' Br. at 2. Furthermore, Plaintiffs alleged that the FHWA violated Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, by "failing to undertake investigations necessary to identify the Project's foreseeable impacts to historic properties prior to the issuance of the Record of Decision approving the Project for construction." *Id.* at 3. The District Court for the District of Columbia refused to enter a TRO and granted the FHWA's motion to transfer the case to the

---

[1](...continued)
Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, and ensuring compliance with that Act.

-7-

District of New Mexico. *See Valley Cmty. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23 (D.D.C. 2002) (*Valley Cmty. I*). The District Court for the District of New Mexico denied the Plaintiffs' motion for preliminary injunction and injunction pending appeal, adopting and supplementing the opinion of the D.C. District Court and finding that Plaintiffs did not have a likelihood of success on the merits. *See Valley Cmty. Pres. Comm'n v. Mineta*, 246 F. Supp. 2d 1163 (D.N.M. 2002) (*Valley Cmty. II*). Construction on the Hondo Valley Project has been ongoing since September 26, 2002.

## II. LEGAL BACKGROUND

### A. Standard of Review

#### 1. Preliminary Injunction

The standard of review in this case is somewhat bifurcated. First, we review district court's denial of a motion for preliminary injunction for abuse of discretion. *Davis v. Mineta*, 302 F.3d 1104, 1110-11 (10th Cir. 2002). "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Id.* at 1111 (internal citations omitted).

In order to receive a preliminary injunction, a plaintiff must establish the following four factors:

(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest.

*Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). If a plaintiff establishes that the latter three factors "tip strongly" in his or her favor, the likelihood of success inquiry is modified somewhat, and the plaintiff may establish likelihood of success "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Id.*

### 2. Administrative Procedure Act

In analyzing the Plaintiffs' likelihood of success on the merits, we must examine the FHWA's compliance with Section 4(f). "At this point, a second layer of review comes into play, because defendants' agency actions are themselves examined under a highly deferential, 'arbitrary and capricious' standard." *Davis*, 302 F.3d at 1111.

As Section 4(f) does not provide an independent cause of action, judicial review is available only through Administrative Procedure Act, 5 U.S.C. § 706,

which provides that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (citing 5 U.S.C. § 706(2)(A), (B), (C), (D) (1964 ed., Supp. V)). As we have noted, "*Overton Park* instructed reviewing courts to conduct a three-tiered inquiry of the Secretary of Transportation's decision to fund a highway across land covered by § 4(f)." *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1549 (10th Cir. 1993). This three-tier inquiry involves determining: 1) "whether the Secretary acted within the scope of his authority under § 4(f);" 2) "whether the Secretary's ultimate decision was 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law,'" and 3) "whether the Secretary's action followed the necessary procedural requirements." *Id.* (internal quotation marks omitted).

**B. Section 4(f) and Section 106**

All federally funded highway projects must comply with a number of federal environmental protection and historic preservation laws, including Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f; Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c); and the National Environmental Policy Act, 42 U.S.C. § 4332(C). Although Plaintiffs

originally alleged violations of both the National Environmental Policy Act and Section 4(f) of the Department of Transportation Act, this appeal challenges only the FHWA's compliance with Section 4(f). Section 4(f) provides, in relevant part, that

> [t]he Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if–
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

Section 4(f) restrictions apply anytime a proposed highway construction project entails a "use" of a Section 4(f)-protected property. A "use" of a protected property may be "direct" ("[w]hen land is permanently incorporated into a transportation facility") or "constructive" ("when the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired."). 23 C.F.R. § 771.135(p)(1)(i), (p)(2).

The procedure for determining what sites merit protection under Section 4(f) is set forth in FWHA regulations at 23 C.F.R. § 771.135. Pursuant to these regulations, a structure qualifies for Section 4(f) protection if it is either on or eligible for the National Register of Historic Places. *Id.* § 771.135(e). The Section 4(f) evaluation must be conducted during the planning process, and in any event, the final Section 4(f) determination must be presented in the Final EIS or the ROD. *See id.* § 771.135(b) ("Any use of lands from a section 4(f) property shall be evaluated early in the development of the action when alternatives to the proposed action are under study."); § 771.135(*l*) ("For actions processed with EISs, the Administration will make the section 4(f) approval either in its approval of the final EIS or in the ROD.").

In order to determine what sites merit protection under Section 4(f), the FHWA relies in large part on reviews conducted pursuant to Section 106 of the National Historic Preservation Act. Section 106 provides a process through which effected historic sites are identified, while Section 4(f) limits the circumstances in  which the sites identified through the Section 106 review process can be "used." Therefore, although Plaintiffs expressly challenge only the FHWA's compliance with Section 4(f), Section 106 is also relevant to this litigation. *See City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) ("[W]e have observed that compliance with section 4(f) is predicated upon

completion of the section 106 process.").

> Section 106 of the National Historic Preservation Act provides that before a federal agency may authorize the expenditure of funds for a federal or federally assisted undertaking, it must first consider the effects of such an undertaking on "any district, site, building, structure, or object that is included or eligible for inclusion in the National Register [of Historic Places]."

*Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 370 (D.C. Cir. 1999) (quoting 16 U.S.C. § 470f). This consideration involves identifying all historic properties within a designated "area of potential effects" for the project in consultation with the SHPO. The "area of potential effects" is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d). Unlike Section 4(f), Section 106 is essentially a procedural statute and does not impose a substantive mandate on the FHWA. *See City of Alexandria,* 198 F.3d at 871.

## III. DISCUSSION

We now turn to the four preliminary injunction factors. Because the appropriate standard for evaluating the Plaintiffs' likelihood of success on the merits depends on whether the other three factors are satisfied, we look first to the three equitable or "harm" factors: 1) the harm that the Plaintiffs will suffer if the injunction is denied; 2) the balancing of the harm that the FHWA will suffer if

the injunction is granted; and 3) the harm to the public interest. We then address the Plaintiffs' likelihood of success on the merits.

## A. Harm to Plaintiffs, Balancing of Harm to Defendants, and Public Interest

Plaintiffs contend that "the district court never addressed the remaining equitable factors bearing on the issuance of injunctive relief." Aplts' Br. at 48. However, while the district court did address the Plaintiffs' likelihood of success on the merits in greater detail than the other three factors, it nevertheless concluded that Plaintiffs "have met none of the requirements for a preliminary injunction." *Valley Cmty. II*, 246 F. Supp. 2d at 1177. We now examine the equitable factors and hold that while the Plaintiffs may suffer some harm as a result of the denial of the injunction, the district court correctly concluded that the balance of harms and the public interest weigh in favor of the FHWA.

### 1. Harm to Plaintiffs

"The substantive harm contemplated by § 4(f) is the actual harm to parkland or historic sites that will occur if the Secretary of Transportation does not (1) consider every prudent and feasible alternative to using the land, and (2) make all possible plans to minimize the harm, if use is required." *Davis*, 302 F.3d at 1115. Environmental harm is, by its nature, generally irreparable. *Id.* An individual plaintiff can establish that he or she will suffer harm from a construction project by demonstrating "adequate proximity to and use of" the land

-14-

in question. *Id.* The Plaintiffs have certainly established adequate proximity in this case. Plaintiffs live in the area and use the land in question; in fact, many of the historic acequias at issue in this case are actually located on land owned by the Plaintiffs. Any damage to the land or structures along U.S. 70 as a result of the project is likely to cause the Plaintiffs irreparable harm. Moreover, even assuming that the FHWA's determination that the project will not use any protected properties is correct, the Plaintiffs' enjoyment of their land will undoubtedly suffer somewhat as a result of the greater proximity of a major highway.

## 2. Balancing of Harm to Defendants

The FHWA has already invested a substantial amount of money in this construction project. Over $52 million was invested between August 1, 2002, and February 12, 2003. According to a declaration by the NMSHTD's Design Compliance Engineer for the Hondo Valley Project, a suspension of construction would cost $144,000 per day, or $4,320,000 per month. A permanent termination of the project would cost $11,537,000, including demobilization and clean-up costs. Given these figures, it is clear that the FHWA will suffer significant financial harm if the injunction is granted.

While these costs cannot be ignored, financial concerns alone generally do not outweigh environmental harm. *See Citizens to Preserve Overton Park, Inc.*,

401 U.S. at 412-13 ("Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes [i.e., Section 4(f)] indicates that protection of parkland was to be given paramount importance."). We have previously accorded less weight to financial harms relative to environmental harms when the financial harms are "self-inflicted." *See Davis*, 302 F.3d at 1116 (noting that "it appears that many of these costs [of delay] may be self-inflicted. . . . [because] the state entities involved in this case have 'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result.").

Whether the financial harm the FHWA will suffer if the injunction is granted outweighs the harm the Plaintiffs will suffer if it is not seems to turn on the merits of the case. If the FHWA did not comply with Section 4(f), but rather "jumped the gun" and began construction before completing the necessary environmental reviews, then the environmental harm faced by the plaintiffs *may* outweigh the FHWA's financial harm. If the FHWA complied with all relevant environmental laws and correctly determined that the project will not use a Section 4(f)-protected property, then the balancing of harms weighs in favor of the defendants. The Plaintiffs have not, therefore, established that the balancing of the harms tips strongly in their favor.

**3. Public Interest**

-16-

There are conflicting public interest values at play in this case. On the one hand, the public interest is served by safer highways and increased economic development. On the other hand, the public interest is served by strict compliance with environmental laws and the preservation of historic and cultural resources. In *Davis v. Mineta*, we held that "the public interest associated with completion of the Project must yield to the obligation to construct the Project in compliance with the relevant environmental laws." 302 F.3d at 1116. However, in that case, "the proposed highway construction ha[d] not yet begun, and so we [we]re not confronted with equities in favor of completion of a partially-completed project." *Id.* In this case, we are dealing with a partially-completed project, and as such, the public interest in favor of continuing the project is much stronger. This litigation also involves a stretch of road with an exceedingly high accident rate. The well-recognized "important public interest in safety on the roads and highways," *Dixon v. Love*, 431 U.S. 105, 114 (1977), therefore weighs in favor of completing the construction project.

## B. Likelihood of Success on the Merits

As the Plaintiffs have failed to show that each of the three equitable requirements for a preliminary injunction tips strongly in their favor, we now proceed to review the likelihood of success on the merits. Turning to the merits of the case, we must consider Plaintiffs' argument that the FHWA acted

arbitrarily and capriciously in reaching the determination that the Hondo Valley Project would not use any Section 4(f)-protected properties. Specifically, they contend that 1) the FHWA failed to undertake the requisite studies needed to identify and evaluate all protected properties prior to issuing the ROD; and 2) the FHWA employed an inadequate area of potential effects when conducting its pre-ROD studies. These two inquiries are closely related, as the Plaintiffs' argument concerning the unlawful deferral of the Section 4(f) determination rests on the proposition that the Section 106 reviews conducted prior to the publication of the ROD failed to comply with Section 4(f) because the area of potential effects was too narrowly drawn.

1. **Failure to Undertake the Requisite Studies Needed to Identify and Evaluate 4(f)-Protected Properties Prior to Issuing the ROD**

Section 4(f) regulations clearly require the FHWA to make the requisite Section 4(f) evaluations prior to issuing an ROD approving a proposed construction project and to present these determinations in the Final EIS or the ROD. *See* 23 C.F.R. § 771.135(b), (*l*). The threshold question in this case is, therefore, whether the FHWA conducted adequate reviews of the cultural resources and historic properties along the US 70 corridor prior to determining in the ROD that the Hondo Valley Project would not "use" any 4(f)-protected properties.

The Plaintiffs argue that much of the required evaluation was unlawfully

deferred until after the ROD. In making this argument, they rely on the fact that the consultations surrounding the Programmatic Agreement produced a list of 113 properties potentially eligible for the National Register that were not fully evaluated prior to the issuance of the ROD. These properties were apparently not evaluated during the earlier stages of the project because they were outside the area of potential effects used during the Section 106 review process. As further support, the Plaintiffs reference a letter sent to the FHWA by the Advisory Council on Historic Preservation suggesting that the FHWA's "no effect" determination was in error.

### a. *City of Alexandria* and *Corridor H*

In considering the Plaintiffs' argument that the FHWA unlawfully deferred the required evaluations of 4(f)-protected properties, the parties and both the D.C. and New Mexico district courts place a significant amount of emphasis on two cases from the District of Columbia Circuit addressing the timing of Section 4(f) reviews–*Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999), and *City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999). *Corridor H* concerned a plan to build a new segment of highway in West Virginia. The FHWA issued an ROD prior to conducting the requisite Section 106 reviews to identify historic sites potentially impacted by the project. The court held that the FHWA had failed to comply with Section 4(f) by deferring these reviews until

after the issuance of the ROD, despite the fact that the ROD stated that approval of the project was contingent upon successful completion of the Section 106 review process. *Id.* at 371-73.

*City of Alexandria*, decided after *Corridor H*, addressed a challenge to the FHWA's approval of plans to replace the Woodrow Wilson Memorial Bridge. In contrast fo *Corridor H*, *City of Alexandria* held that the FHWA had complied with Section 4(f) because it "identified historic properties along the corridor and documented its findings prior to approval in both a Memorandum of Agreement and a Section 4(f) Evaluation." 198 F.3d at 873. The fact that the FHWA "deferred [] the identification of sites that might be impacted by a small number of 'ancillary activities'" was not sufficient to establish a Section 4(f) violation. *Id.*

We agree with the holding of both district courts that this case is analogous to *City of Alexandria* and factually distinguishable from *Corridor H*. *See Valley Cmty. II*, 246 F. Supp. 2d at 1174; *Valley Cmty. I*, 231 F. Supp. 2d at 34 (noting that "[t]he agency's actions in this case are more akin to *City of Alexandria* than *Corridor H*."). *Corridor H* is somewhat analogous to this case in that both cases involve the adoption of a Programmatic Agreement by the FHWA; however, that is where the similarities end. In *Corridor H*, the FHWA did not perform the necessary Section 106 reviews prior to issuing the Final EIS and the ROD, and

adopted the Programmatic Agreement as an alternate means of complying with Section 4(f). In essence, the Programmatic Agreement was adopted *instead* of performing the Section 106 review process and completing the Section 4(f) determination, in violation of 23 C.F.R. § 771.135(b).

Based on the record in this case, we cannot conclude that the FHWA delayed all necessary reviews until after the issuance of the ROD. It appears the agency made significant efforts to evaluate historic properties along the US 70 corridor for National Register eligibility and to determine whether the Hondo Valley Project would adversely affect such properties. The FHWA performed extensive reviews prior to issuing the Final EIS and the ROD and adopted the Programmatic Agreement for the more limited purpose of analyzing "determinations of effect on any previously unidentified cultural resources and potential impacts to identified cultural resources that may be affected by any design changes and construction activities." Aplts' App. vol. II, at 538. As detailed in the facts above, the agency issued a Draft EIS, a Cultural Resources Survey, and a Supplemental Draft EIS prior to publishing its final determination, consulting with the SHPO throughout the process. Thus, the District Court for the District of Columbia correctly concluded, "[t]he agency has not postponed the entire section 106 process but has merely provided for the contingency that section 4(f)-properties may be discovered as the construction progresses." *Valley*

*Cmty. I*, 231 F. Supp. 2d at 34-35.  This is very similar to the agency action that the D.C. Circuit upheld in *City of Alexandria*.  Plaintiffs have failed to establish that the FHWA declined to follow the necessary procedural requirements by adopting the Programmatic Agreement and deferring the evaluation of certain properties until after the issuance of the ROD.

> b.  The Advisory Council on Historic Preservation's March 29 Letter

As further support for their argument that the FHWA failed to comply with Section 4(f), the Plaintiffs rely on a March 29, 2002, letter from the Advisory Council on Historic Preservation to the FHWA.  In the letter, the Advisory Council

> question[ed] the validity of the earlier no effect and no adverse effect determinations made by FHWA, and concurred in by the New Mexico State Historic Preservation Officer (SHPO), since they were carried out under the terms of the Substitution Agreement Between the Advisory Council and the New Mexico SHPO . . . which expired in April 1999.

Aplts' App. vol. III, at 599 (Letter from Advisory Council on Historic Preservation, dated March 29, 2002).  Based on these "overarching flaws" in the process, the Advisory Council concluded that "FHWA will need to reevaluate all previous findings and determinations related to this undertaking to ensure that the procedures set forth in our regulations are properly met."  *Id.*[2]

---

[2] As an initial matter, we must decide whether we may properly consider the March 29, 2002, Advisory Council letter.  Defendants argue that because the
(continued...)

-22-

Our consideration of the letter does not lead us to conclude that the FHWA's determination of "no effect" was in error. First, the concern over the expiration of the Substitution Agreement between the Advisory Council and the New Mexico SHPO is resolved by a subsequent letter from the Advisory Council to the SHPO.[3] *See* Aples' Supl. App. vol. II, at 443 (Letter from Advisory Council on Historic Preservation, dated May 8, 2002). That letter states:

> Since Federal agencies have submitted numerous projects to the New Mexico SHPO subsequent to the expiration of the Substitution Agreement, we believe that it is necessary to clarify the status of Section 106 reviews concluded during this period. It is our opinion that the outcomes reached . . . between April 1999 and March 2002 . . . shall

---

[2](...continued)
March 29 letter was not included in the administrative record, it is beyond the court's scope of review. *See American Mining Congress v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985) (noting that "[a]ny exception to th[e] general rule against the use of extra-record materials must be extremely limited."). Plaintiffs counter by arguing that the document falls within the established exception for "evidence coming into existence after the agency acted [that] demonstrates that the actions were right or wrong." *Id.*

The document was necessarily absent from the administrative record because it came into existence after the issuance of the ROD. The District Court for the District of Columbia considered the March 29 letter in denying the Plaintiffs' motion for a temporary restraining order. We review the district court's decision regarding whether to consider extra-record materials for abuse of discretion, *see Northcoast Envt'l Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998), and hold that the district court did not abuse its discretion in considering the March 29 letter.

[3] While this letter was also not part of the administrative record in this case, in light of our decision to consider the March 29 letter, we see no reason not to consider the May 8 letter as well. As the Plaintiffs point out, both parties have relied on documents that were not part of the administrative record. *See* Aplts' Reply Br. at 22 n.7.

be binding and evidence satisfactory compliance with the requirements of Section 106, unless the New Mexico SHPO or Council have received a timely and substantive objection from the public.

*Id.*

The Plaintiffs counter the May 8 letter by arguing that it did not relate specifically to the Hondo Valley Project and that the Council did in fact receive timely objections from the public. We acknowledge that the May 8 letter does not speak to the other concerns articulated by the Advisory Council in the March 29 letter. Taking into account the May 8 letter, however, we do not believe that the expiration of the Substitution Agreement alone is evidence of failure to comply with Section 4(f).

Moreover, the other primary concern reflected in the Advisory Council's March 29 letter, "that FHWA did not initiate the consultation process for this undertaking pursuant to 36 C.F.R. Section 800.3," also does not establish that the agency erred. *Id.*, vol. III, at 599. As the D.C. District Court acknowledged, "section 800.3 does not mandate consultation with the public in the instance where it has been determined that the undertaking 'does not have the potential to cause effect on historic properties.'" *Valley Cmty. I*, 231 F. Supp. 2d at 36 (quoting 36 C.F.R. § 800.3(a)(1)). We agree with that district court's finding that the FHWA was "not mandated to adhere to the findings of the [Advisory Council], as they had determined that there would not be any use of historic

-24-

properties." *Id.* We further note that the FHWA did attempt to address the Advisory Council's concerns through the Programmatic Agreement, which the Advisory Council agreed to and signed in July 2002, approximately four months after voicing its concerns in the March 29 letter. Thus the concerns raised in the Advisory Council's March 29 letter do not alter our conclusion that the FHWA complied with Section 4(f).

### 2. Definition of the Area of Potential Effects

Plaintiffs' other major argument concerns the definition of the area of potential effects employed during the Section 106 review process. As described in Part II(B) above, the "area of potential effects" is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d). Plaintiffs contend that the area of potential effects, as defined by the FHWA, was "presumptively invalid," Aplts' Br. at 34, and that as a result, the FHWA's conclusion that no Section 4(f)-protected properties would be used was "[a]rbitrary and [c]apricious." *Id.* at 33.

Establishing an area of potential effects requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Resolving these issues requires a high level of technical expertise and is properly left to the

informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.") (internal citation omitted).

Specifically, the Plaintiffs argue that the area of potential effects a) was arbitrarily set at 150 feet, thus excluding many structures within 200 feet of the roadway; b) excluded many properties that may suffer adverse effects as a result of vibration impacts and/or traffic noise; and c) "focused exclusively on the footprint of the structures themselves, and did not consider the larger property boundaries for these buildings, including any natural or topographical features associated with these buildings." Aplts' Br. at 42.

a. Exclusion of structures within 200 feet of the roadway

The FHWA adopted a variable area of potential effects of between 150 and 500 feet from the edge of the existing US 70. For much, if not most of the roadway, it appears that an area of potential effects of 150 feet was used.[4] Plaintiffs argue that this restrictive area of potential effects resulted in a failure to evaluate the impact of the project on over one hundred buildings located within 200 feet of the roadway. Essentially, Plaintiffs contend that the FHWA should

---

[4] During a field inspection, "the visibility of the current roadway from the properties below the highway profile was assessed, and if the current roadway was not visible from the property and if the new roadway would still not be visible from that property, then the [area of potential effects] was reduced to 150 ft from the edge of pavement." Aplts' App. vol II, at 537-38.

have established an area of potential effects of 200 feet instead of 150 feet.

The FHWA selected the 150-foot variable area of potential effects in consultation with the SHPO, as set forth in Section 106 regulations at 36 C.F.R. §§ 800.4(a). The FHWA explains that "[t]he [area of potential effects] was defined by the area FHWA reasonably believed might be impacted by the Project once it was built, and included considerations for noise, visual effects, and vibrations." Aples' Br. at 35. The determination of the area of potential effects took into account both direct and indirect potential effects of the project and varied "throughout the corridor depending on the type of resource and the nature of [the] potential effect." *See* Aplts' App. vol. II, at 454.

Having carefully reviewed the pertinent regulations, the record before us, and the district court's findings, we conclude, for substantially the same reasons as the district court, that "these variable APEs were based on a consideration of the relevant factors and that there has not been a clear error or judgment." *Valley Cmty. II*, 246 F. Supp. 2d at 1173.

### b. Vibration and noise impacts

Next, the Plaintiffs argue that the 150-foot area of potential effects failed to take into account indirect effects, including vibration impacts resulting from blasting activities and noise impacts resulting from traffic on US 70, that might rise to the level of a constructive use. Having examined the record, we conclude

that Plaintiffs have not established that the Hondo Valley Project will use any Section 4(f)-protected properties, either directly or constructively.

The FHWA regulations explicitly address vibration impacts, distinguishing between vibration impacts that result from construction activities and vibration impacts that result from the operation of a facility. Vibration impacts resulting from construction activities are not considered a "use" under Section 4(f) provided "[v]ibration levels from project construction activities are mitigated, through advance planning and monitoring of the activities, to levels that do not cause a substantial impairment of the section 4(f) resource." 23 C.F.R. § 771.135(p)(5)(ix). In this case, the FHWA adopted a vibration monitoring program to include "monitoring before and during project construction, and visual inspections of potentially affected buildings to determine pre-construction conditions and to identify any structural damage that occurs during construction." Aples' Supl. App. vol. II, at 183 (Final EIS). The plan provided for repair of any damage resulting from construction. We are satisfied that this monitoring program comports with the regulations so as to avoid a constructive use as a result of construction-related vibrations.

The Plaintiffs' contention that traffic noise may result in a constructive use is also without merit. The Plaintiffs suggest that the new four-lane highway will result in a permanently increased traffic volume; however, there is no evidence to

support this assertion. In fact, the Final EIS concluded that "[t]raffic volumes on US 70 are expected to be similar with all three alternatives," including the no-build alternative. *Id.* The Plaintiffs have not established that "[t]he projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f)," 23 C.F.R. § 771.135(p)(4)(i), thus we cannot conclude that the FHWA failed to evaluate indirect effects of the project that may result in a constructive use.

c. Consideration of properties in their entirety

Finally, the Plaintiffs argue that the FHWA adopted too narrow a focus by limiting its analysis to buildings and structures and failing to consider "larger property boundaries" and "character-defining features in the identification of the historic buildings within the project's area of potential effects." Aplts' Br. at 42. The District of New Mexico found "nothing in the record to support Plaintiffs' argument that Defendants focused mostly on buildings themselves and did not consider natural and topographical features that are part of an historic site." *Valley Cmty. II*, 246 F. Supp. 2d at 1174. We agree with this assessment of the record.

The FHWA's Supplemental Draft EIS explained that "[e]ligible buildings include the building and its immediate environment, including all acreage

historically associated with the building that is within the current property boundary and any historic landscape feature considered to be contributing to the eligibility of the building." Aplts' App. vol. II, at 456-57. Similarly, the ROD noted that "[t]he boundaries as well as the character-defining features of each property were considered in the evaluation process for visual effects." *Id.* at 538. The Plaintiffs suggest that this language is simply "lip-service" and that the schematic drawings appended to the Cultural Resources Survey "confirm, by omission" that the focus was on the buildings and not the surrounding environment. Aplts' Br. at 42. We cannot conclude from the fact that some schematic drawings focused on the buildings themselves that the FHWA did not take into account the environment and character-defining features of the properties within the area of potential effects. The Plaintiffs have thus failed to demonstrate that the FHWA's decision to apply a 150-foot area of potential effects was arbitrary and capricious or an abuse of discretion.

## III. CONCLUSION

Having found that the Plaintiffs failed to satisfy the requirements for a preliminary injunction, we AFFIRM the district's court denial of Plaintiffs' motion for preliminary injunction and injunction pending appeal.