**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THE VILLAGE OF LOGAN,

     Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
INTERIOR; THE HONORABLE SALLY
JEWELL, in her capacity as Secretary,
Department of the Interior; THE
BUREAU OF RECLAMATION; THE
HONORABLE MICHAEL L. CONNOR,
in his capacity as Commissioner, The
Bureau of Reclamation; EASTERN NEW
MEXICO WATER UTITLITY
AUTHORITY,

     Defendants - Appellees.

No. 13-2082
(D.C. No. 1:12-CV-00401-WJ-LFG)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **EBEL**, and **PHILLIPS**, Circuit Judges.

Plaintiff-Appellant the Village of Logan ("Logan") appeals from the district court's

order denying Logan a preliminary injunction to prevent Defendants-Appellees the

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.   It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Department of Interior, the Bureau of Reclamation, and the Eastern New Mexico Water Utility Authority as well as a number of individual defendants (collectively "Defendants") from undertaking any work on the Eastern New Mexico Rural Water System Project until they prepare an Environmental Impact Statement in compliance with the National Environmental Policy Act of 1969. The district court refused to enjoin the Project preliminarily not only because the court found that delaying the Project would be contrary to the public interest, but also because Logan had failed to establish that it was likely to succeed on the merits of its underlying claims. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we AFFIRM.

## BACKGROUND

The Canadian River Compact ("Compact") allocates water from the Canadian River watershed to the states of New Mexico, Oklahoma, and Texas. Following its ratification, New Mexico constructed the Ute Reservoir ("Reservoir") on the Canadian River just west of Logan as a way to store the water New Mexico had been allocated under the Compact. Although the Reservoir was initially intended as a source of water for municipal and industrial use—and more specifically, as a way to replace the declining ground water supply in eastern New Mexico—it has since become a popular destination for outdoor recreation activities such as boating, fishing, and camping. The Reservoir is owned and operated by the New Mexico Interstate Stream Commission ("ISC"). While the Compact regulates the amount of water that can be stored in the Reservoir, it is the ISC that

2

determines how much water can be removed from the Reservoir. That authority, however, is constrained by a 1962 Memorandum of Agreement ("Agreement"), entered into by the ISC and a predecessor of the New Mexico Department of Game and Fish ("NMDGF"), establishing a minimum reservoir elevation of 3,741.6 feet. Also referred to as the "fisheries minimum pool," this water elevation must be maintained at all times, meaning that the ISC is required to stop all withdrawals from the Reservoir once that elevation is reached. The Agreement was most recently renewed in 2010.

Following a sustainable yield analysis, the ISC determined that up to 24,000 acre-feet per year of water (AFY) can safely be removed from the Reservoir. Since 1997, the entire yield of the Reservoir has been contracted to the Ute Reservoir Water Commission ("UWC"), which has the option to purchase up to 24,000 AFY for beneficial consumptive uses, including municipal and industrial, sanitation, irrigation, and recreation uses. The UWC is a twelve-member consortium that includes the Eastern New Mexico Water Utility Authority ("ENMWUA") members (the municipalities of Clovis, Elida, Grady, Melrose, Portales, and Texico; and Curry and Roosevelt counties) and the UWC Quay County entities (Logan, City of Tucumcari, and Quay County). Under the most-current iteration of the contract, 16,450 AFY is allocated to the ENMWUA members and the remaining 7,550 AFY is allocated to the UWC Quay County entities. While the UWC is responsible for funding and constructing any water diversion or conveyance facilities, the contract makes clear that all diversion projects, and any water withdrawals

3

themselves, must be approved by the ISC. To this end, the contract provides that the UWC's right to purchase water is subject to the availability of water, and that the ISC is solely responsible for determining whether water is available. Should the Reservoir drop below the 3,741.6-foot minimum elevation set by the Agreement, for instance, the ISC can determine that water is not available and discontinue deliveries under the contract.

The Eastern New Mexico Rural Water System Project ("Project") was conceived as a way to provide the ENMWUA members and Canon Air Force Base (collectively the "Participating Communities") with a long-term sustainable municipal water supply, including drinking water. At this time, the Participating Communities' sole source of water is ground water from the Ogallala aquifer, which underlies portions of New Mexico, Texas, Oklahoma, and Kansas and serves many other water diversion purposes—the largest of which is irrigated agriculture. Because historical demand has significantly exceeded aquifer recharge, the net result has been declining water levels throughout the Ogallala aquifer. These declining water levels have complicated the Participating Communities' ability to provide a reliable water supply in two ways, one quantitative and one qualitative. As the water levels in the acquifer have dropped, so too have well production rates, meaning that there is simply less water to be had. Equally troublesome, however, is that water quality is also diminishing, as aquifer declines have contributed to increased concentrations of constituents such as total dissolved solids, arsenic, fluoride, iron, radon, and volatile organic compounds in the ground water. Indeed, four of the

4

Participating Communities are already experiencing difficulty complying with state and federal drinking water standards.

The goal of the Project is to construct a pipeline and the associated intake, pumping, treatment, storage, and delivery facilities necessary to deliver 16,450 AFY from the Reservoir to the Participating Communities in order to meet a portion of their current and future water supply needs. Although the Project's intake structure has been designed, at the request of New Mexico state legislators, to allow for up to 24,000 AFY in withdrawals in order to accommodate the UWC Quay County entities in the event that they exercise their option to purchase the 7,550 AFY that has been separately allocated to them, delivery systems for such withdrawals are not planned or permitted at this time and are not part of the Project. Indeed, other than the intake structure, the remaining components of the Project (including all pipes, booster pumps, and water treatment facilities) have been designed and funded to deliver only a maximum of 16,450 AFY from the Reservoir to the Participating Communities. In other words, if at some point the UWC Quay County entities elect to purchase water that has been allocated to them, they will need to design, fund, and construct their own delivery project(s) in order to withdraw any water from the Reservoir using the Project's intake structure.

When Congress authorized the Bureau of Reclamation ("Reclamation") to provide financial and technical assistance to the Project, it triggered the National Environmental Policy Act ("NEPA"), requiring Reclamation to prepare an Environmental Assessment

5

("EA") studying the Project's environmental impacts. Reclamation began the NEPA scoping process in September 2007, when it asked members of the public and various government officials—including Logan's Village Administrator—to help Reclamation identify, among other things, "[t]he important issues, resources concerns, and possible impacts to be addressed in the EA." Aplt. App. at 599. Neither the Village Administrator nor any other Logan representative responded to Reclamation's request. Reclamation continued to scope the Project by holding a series of public meetings in Logan, Clovis, and Portales, where it once again sought and received input on which issues should be evaluated in the EA. Although Logan's Village Administrator was present at the Logan meeting, neither he nor any other Logan representative offered any comments or made any objections to the Project at that time.

On January 13, 2010, after considering the issues raised during scoping, Reclamation issued a draft EA and a Finding of No Significant Impact ("FONSI"), explaining that Reclamation did not intend to prepare an Environmental Impact Statement ("EIS") for the Project. As relevant here, the draft EA defined the proposed federal action as providing funding to construct a system to deliver 16,450 AFY of water from the Reservoir to the Participating Communities. The draft EA also made clear that the FONSI was based on, among other things, the most recent ten-year bathymetric survey (from 2002) and on forty-one years of historic hydrologic data (from 1966 to 2007). Reclamation's preliminary findings were made available at public libraries and over the

6

internet, and Reclamation provided a public comment period on the draft EA and FONSI until February 19, 2010. In order to facilitate public comment, Reclamation held another public meeting in Logan on January 19, 2010. Logan's Village Administrator attended the meeting, but again, neither he nor anyone else offered any comments on the draft EA or FONSI. Indeed, Reclamation received but two comments throughout the public comment period, one from NMDGF on potential effects to fishery resources and one from Western Resource Advocates on possible renewable energy sources for the Project. On January 28, 2011, after addressing both of these comments, Reclamation issued a final EA finding "that there [will] be no significant impacts associated with the proposed action" and, thus, that "no environmental impact statement will be prepared." Aplt. App. at 72.

More than a year later, despite making no comments or objections to the Project at any time during the administrative process, Logan filed suit in federal district court seeking to enjoin the Project. Asserting that it was "inexplicabl[e] . . . that the massive construction project 'would not result in any significant impacts to the environment,'" Logan alleged that Defendants had violated NEPA by failing "to take a hard look at the actual and potential adverse environmental consequences of the proposed Ute Lake Diversion Project." First Amended Complaint, Doc. 9 at. 2-3. Logan sought a declaratory judgment holding that Defendants had committed eight distinct NEPA violations, as well as a mandatory injunction preventing Defendants from undertaking any work on the Project until after they completed a full EIS.

7

Shortly thereafter, Logan moved the district court to enter the preliminary injunction at issue here, which the district court denied. In a thorough and well-reasoned opinion, the district court held not only that Logan had failed to demonstrate a likelihood of success on the merits, but also that the public interest weighed in favor of denying the preliminary injunction. While acknowledging that Logan has an important interest in continued recreation at the Reservoir, the court recognized that "that interest must defer to the need for potable drinking water and for support for municipal and irrigation purposes." Doc. 56 at 32. Logan filed a motion for reconsideration, which the district court also denied. Then, after timely appealing the denial of its preliminary injunction motion, Logan raised its prospect of injunctive relief for a third and fourth time when it requested both the district court and this court to enjoin the Project pending appeal. Applying essentially the same four-factor test that governs here, both courts again rejected Logan's claim that an injunction was warranted. See Doc. 85 at 5; Tenth Circuit Order, July 2, 2013 at 2. We now take up the district court's denial of Logan's underlying preliminary injunction motion.

## DISCUSSION

This court reviews a district court's decision to deny a preliminary injunction under a deferential abuse of discretion standard. See Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1262 (10th Cir. 2005). Particular deference is owed to the district court's "balancing of conflicting [preliminary injunction] factors," Water Keeper Alliance

8

v. U.S. Dep't of Defense, 271 F.3d 21, 30 (1st Cir. 2001), and the "court's decision will not be disturbed unless [this] court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Somerlott v. Cherokee Nation Distributors, Inc., 686 F.3d 1144, 1152 (10th Cir. 2012) (internal quotation marks omitted). Reviewing the district court's factual findings for clear error and legal determinations de novo, our task is merely to determine whether the district court made "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1227 (10th Cir. 2011). Finding nothing of the sort here, we now affirm the district court's denial of Logan's preliminary injunction motion.

## I. The district court did not abuse its discretion in denying Logan a preliminary injunction

"A preliminary injunction is an 'extraordinary and drastic remedy.'" Munaf v. Geren, 553 U.S. 674, 689 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (internal quotation marks omitted). A preliminary injunction is "never awarded as of right," id., but only when "the movant's right to relief is 'clear and unequivocal.'" Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). In order to obtain a preliminary injunction, therefore, a plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

9

that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. "'[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" id. at 24, and a plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted. See id. at 23-24; accord Sierra Club, Inc. v. Bostick, 539 F. App'x 885, 888-89 (10th Cir. 2013) (unpublished) ("A party seeking a preliminary injunction must prove that all four of the equitable factors weigh in its favor."). As we explain herein, a preliminary injunction would be particularly inappropriate in this case because Logan has not established that any of the four factors weigh in its favor.

### a. Failing to enjoin the Project will not cause Logan to suffer irreparable harm

In order to receive a preliminary injunction, the moving party must establish that it will suffer irreparable harm without the preliminary injunction—that is, that failing to grant the injunction will cause plaintiff to suffer an injury that is not "merely serious or substantial" but "certain, great, actual and not theoretical." Heideman, 348 F.3d at 1189 (internal quotation marks omitted). Logan asserts that it meets this prong of the preliminary injunction test because failing to enjoin the Project will allegedly condone "patent NEPA violations" and result in "actual, imminent harm . . . including loss of revenue, aesthetic impairment, declining property values and business devaluation, and degradation of the fisheries population," Aplt. B. at 52-53. However, the injuries that Logan alleges as support for that assertion are inadequate to justify enjoining the Project

10

because Logan has not shown the asserted damages to be certain, great, actual and not theoretical.

Nor can Logan make the irreparable harm showing by pointing to what it refers to as "the presumption of harm conferred . . . as a result of the patent NEPA violations." Aplt. B. at 52. While it is true "that harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure," Davis v. Mineta, 302 F.3d 1104, 1115 (10th Cir. 2002), that presumption only applies in cases where NEPA violations are likely to have occurred, see id. at 115 n. 6, and as we explain below, Logan has not made that showing here. But even if it had, Davis also makes clear that the NEPA presumption does not absolve a plaintiff from having to "make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests," id. And here, the only specific interests to which Logan points are "aesthetic impairment" and "degradation of the fisheries population," Aplt. B. at 52-53—neither of which is sufficient to warrant injunctive relief under the circumstances.

Although we do not doubt that causing aesthetic harm to the environment or degrading the fisheries population could, in some situations, result in irreparable harm, Valley Cmty. Preservation Comm'n v. Mineta, 373 F.3d 1078, 1086 (10th Cir. 2004), a preliminary injunction is warranted only if "the injury complained of is of such imminence that there is a clear and present need for equitable relief." Heideman, 348 F.3d at 1189 (internal quotation marks omitted). According to Logan's own admissions, however, no

11

such need exists in this case. It is not necessary, or for that matter possible, to enjoin the underwater blasting that Logan contends degraded the Reservoir's fisheries population because that blasting is now complete, see ENMWUA B. at 9, and it should go without saying that any harms allegedly resulting from past detonation activities cannot be relieved, let alone prevented, by enjoining the Project at this point. After all, "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." Schrier v. Univ. of Colo., 427 F.3d 1253, 1267 (10th Cir. 2005).

Logan's "aesthetic impairment" allegation is similarly inadequate to meet the irreparable harm showing, but for essentially the opposite reason: it is simply too speculative to warrant enjoining the Project at this time. For one thing, Logan makes no attempt to appraise this court of any evidence showing what aesthetic damage will occur, where it will occur, how it will occur, or when it will occur—it merely posits that such harm will result. Such ipse dixit, however, is an insufficient basis to enjoin a project which, as we explain in the next section, is vital to the public interest. See Schrier, 427 F.3d at 1267. Further, Logan freely admits that the Project will not be completed and operational "for at least a decade." Aplt. B. at 54. Despite Logan's protestations to the contrary, therefore, the harms that might potentially result from any far-in-the-future water withdrawals are not "of such imminence that there is a clear and present need for equitable relief." Heideman, 348 F.3d at 1189 (internal quotation marks omitted, emphasis in

12

original).

> **b. The injuries that Defendants would suffer under an injunction outweigh the threatened injuries to Logan**

Logan has also failed to establish that "the balance of equities tips in [its] favor," Winter, 555 U.S. at 20—that is, that the injuries it will suffer in the absence of an injunction outweigh the injuries that Defendants will suffer under an injunction.  See Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012).  We have already observed that Logan has failed to make an adequate showing that it will suffer future damages that could be remedied by an injunction at this state in the project.  On the other side of the equation, Defendants have shown that they would suffer immediate and significant harm in the form of construction related delays if an injunction issues now stopping this project.  The economic cost alone of stopping construction cannot easily be overlooked—one estimate puts the probable monthly cost of delaying the Project at $745,592, see Doc. 85 at 4.  In light of the fact federal funds for the Project are capped, and given the propensity of trials to drag on in the federal system, enjoining the Project until after trial would impose a considerable financial burden on the ENMWUA.  See, e.g., Wilderness Workshop v. U.S. Bureau of Land Mgmt., 531 F.3d 1220, 1231 (10th Cir. 2008); accord Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987)  Perhaps more worrisome, though, is that stopping construction until after trial would also extend the completion date of an already complex and time-consuming Project.  Although Logan contends that the Project's ten-year timeline renders any injunction-created delays inconsequential, we disagree:

13

given the real need for potable drinking water in eastern New Mexico, the fact that the Project will take years to build is all the more reason to keep its construction on pace. See Valley Cmty. Pres. Comm'n, 373 F.3d at 1087 ("[W]e are dealing with a partially-completed project, and as such, the public interest in favor of continuing the project is much stronger.").

### c. Enjoining the Project would be contrary to the public interest

Perhaps the greatest reason to deny Logan a preliminary injunction is that enjoining the Project would be contrary to the public interest. See Winter, 555 U.S. at 23 ("A proper consideration of [the public interest factor] alone requires denial of the requested injunctive relief."). As outlined above, the Participating Communities currently rely on ground water from the Ogallala aquifer for their sole source of water, and with water demand exceeding aquifer recharge, the long-term viability of that aquifer is being called into question. These dropping water levels have decreased well production rates throughout the Participating Communities, forcing them to build new wells or extend their existing wells just to find water. In some of the Participating Communities, moreover, drilling new wells also comes with added cost of building additional water treatment infrastructure, as declining water levels have hindered water quality to such an extent that these communities are having trouble complying with state and federal drinking water standards. As the district court recognized, in short, the citizens of eastern New Mexico have a vital need for an alternative water source that can supply "potable drinking water

14

and . . . support for municipal and irrigation purposes," Doc. 56 at 32. Logan again makes much of the fact that the Project likely cannot fill that need for years to come, but as just discussed, that counsels against delaying the Project any further at this point.

### d. Logan is unlikely to succeed on the merits of its claims

The district court denied Logan's preliminary injunction motion primarily because it determined that Logan had not shown that it was likely to succeed on the merits of its underlying claims. See Doc. 56 at 29. As outlined on appeal, Logan's underlying challenges to the Project are as follows: 1) NEPA required the preparation of a full EIS, rather than the less detailed EA, to have been prepared for the Project, see Aplt. B. at 29; 2) the EA improperly segmented the Project by defining it as an action to withdraw 16,450 AFY, not 24,000 AFY, see id. at 31; 3) the EA failed to consider the "direct" socioeconomic effects of withdrawing 24,000 AFY from the Reservoir, see id. at 39; 4) the EA relied on stale data when concluding that the Project would not have a significant impact on the sustainability of the Reservoir, see id. at 39; 5) the EA failed to address the environmental impacts of the controlled blasting that was used during the construction of the Project's intake structure, see id. at 24. While the foregoing analysis makes it unnecessary for us to consider Logan's likelihood of success on these claims—because Logan has not met any of the other three indispensable preliminary injunction factors to this point—we have the authority to do so nonetheless, see Winter, 555 U.S. at 31, and

15

believe it is appropriate to exercise that authority here given Logan's abject failure to participate in the administrative process.[1]

"Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)); accord New Mexico Envtl. Imp. Div. v. Thomas, 789 F.2d 825, 835-36 (10th Cir. 1986) ("If EID wished that the EPA consider a different formula which required EPA to study other information, it had a responsibility to place such information in the record."). Unless the issue with the proposed action is "so obvious that there is no need for a commentator to point [it] out," or some other extraordinary extenuating circumstance exists, failing to raise an issue during

---

[1] The parties disagree about what exactly Logan must show in order to meet the merits prong of the preliminary injunction test. Prior to the Supreme Court's decision in Winter, this court imposed two different tests depending on the circumstances of the case: in the run-of-the-mill case, we required a plaintiff to show "a substantial likelihood of success on the merits," Wilderness Workshop, 531 F.3d at 1224 (emphasis added), but if a plaintiff could establish that the other three preliminary injunction factors "tip strongly in his or her favor," we said the plaintiff needed only to show "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation," Valley Cmty. Pres. Comm'n, 373 F.3d at 1084. There is now a question whether either test survived Winter, where the Court stated that to meet the merits prong, a plaintiff needed to show that he was "likely to succeed on the merits," 555 U.S. at 20. But we need not resolve that question here because Logan has shown neither that the other three factors tip strongly in its favor nor that it is likely, let alone substantially likely, to succeed on the merits.

16

the administrative proceedings precludes a plaintiff from later raising that objection for the first time in court. Pub. Citizen, 541 U.S. at 764-65. Simply put, in other words, courts will not entertain any NEPA challenge that could reasonably have been but was not presented to the agency during the administrative process. See Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 785 (10th Cir. 2006); accord Am. Frozen Food Inst. v. Train, 539 F.2d 107, 134 (D.C. Cir. 1976). ("What the industry failed to present to the Administrator during rule-making procedures when specifically asked to comment cannot now be urged [as] a basis for invalidation [of the rule].").  "The policy behind such a rule, i.e., refusal to consider issues not presented to the agency, is sound, for we may not substitute our judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its expertise." Thomas, 789 F.2d at 835.

Applying this well-settled rule to the circumstances presented here, we must reject as waived the majority of Logan's challenges to the Project. Although Logan now asserts that the Project requires a full EIS rather than a mere EA, the draft EA and FONSI made clear that no EIS was going to be prepared for the Project. See Aplt. App. at 72. By not objecting to the FONSI during the administrative process, Logan forfeited its right to raise that objection for the first time in court. See Silverton Snowmobile Club, 433 F.3d at 785 (finding waiver of the same). Because the draft EA also made clear that the Project was defined as an action to deliver up to 16,450 AFY from the Reservoir to the Participating Communities, and Logan never challenged the defined scope of the Project at any time

17

during the administrative process, Logan is likewise precluded from now arguing that the Project should have been defined and analyzed as a project to deliver up to 24,000 AFY from the Reservoir. For similar reasons, moreover, Logan also forfeited its third challenge to the Project: although Logan now contends that the EA is deficient because it labeled as "cumulative" and not "direct" the socioeconomic effects of withdrawing 24,000 AFY from the Reservoir, the draft EA made clear that its direct impact analysis would be capped at withdrawals up to 16,450 AFY.

Foreclosing judicial review of an agency action is no doubt a drastic remedy, but we are convinced it is the appropriate action under the circumstances. This is not a case where the individual challenging the agency's compliance with the NEPA process was prevented from participating, or was otherwise unable to participate, in that process. Much to the contrary, Defendants actually involved Logan at every step of the administrative process, including by requesting its input on the Project by letter and by inviting it to attend multiple public meetings on the Project in Logan itself. Yet, despite receiving that correspondence and attending those meetings, Logan never made any comments or objections to the Project at any time during the administrative process. Indeed, as Logan's Village Administrator would later admit, "[t]he reason the Village of Logan made no effort to challenge the proposed pipeline during the EA process was because we made a conscious decision to not take any steps to challenge the pipeline." Aplt. App. at 1030. Logan asserts that that decision was based on its belief that the ISC

18

had agreed to raise the minimum fisheries pool from 3,741.6 feet to 3,765 feet—an agreement that Defendants say never existed—but we fail to see how that understanding could possibly save Logan's claims when "the EA clearly referred to the original, lower minimum pool, rather than [Logan's] preferred, higher level." Doc. 56 at 6. As the district court recognized, in other words, just "[b]ecause Plaintiff believed that lower minimum would not be enforced does not change Defendants' analysis of the Project's impact at that level." Id. More simply, it matters not why Logan chose not to participate in the NEPA process; having consciously made that choice, Logan must now live with it.

Once these waiver principles are applied, Logan only asserts two challenges to the EA that are properly before this court—neither of which is likely to succeed on the merits. Although Logan cannot be said to have waived its claim that the EA relied on stale data when concluding that the Project would not have a significant impact on the sustainability of the Reservoir—because Logan bases that claim on a 2012 study that only became available after the public comment period closed—Defendants likewise cannot be faulted for failing to consider a study that was published after the EA was published in 2011. See Am. Mining Congress v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985) ("[T]he agency's action must be reviewed . . . on the evidence and proceedings before the agency at the time it acted."). In any event, moreover, the district court also rejected the factual premise of Logan's stale data claim, finding "that the accumulation projected in the EA matched the accumulation documented in the 2012 study," Doc. 56 at 16, and Logan has given us no

19

reason to adjudge that finding clearly erroneous.   All that remains, then, is Logan's claim

that the controlled blasting used to construct the Project's intake structure "is a significant

impact that was omitted in the EA process and one that, in and of itself, compels an EIS

analyzing all environmental impacts," Aplt. B. at 28-29.   As we alluded to above,

however, requiring Defendants to supplement the EA to study the impacts of controlled

detonation after that controlled detonation has already occurred "would be futile."   See

Highway J Citizens Grp. v. Mineta, 349 F.3d 938, 960 (7th Cir. 2003).   For the foregoing

reasons, therefore, Logan is unlikely to succeed on the merits of its claims.[2]

## CONCLUSION

Having determined that Logan failed to establish that any of the four preliminary

injunction factors weigh in its favor, we now AFFIRM the district court's denial of

Logan's preliminary injunction motion.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge

---

[2] Appellant's Motion to Supplement the Record is denied.